594 A.2d 99

**R & T CONSTRUCTION COMPANY et al.**

v.

**Thomas Claude JUDGE.**

**No. 97 Sept. Term, 1990.**

Court of Appeals of Maryland.

Aug. 22, 1991.

Motion for Reconsideration Denied Oct. 4, 1991.

Ronald S. Canter (Wolpoff and Abramson, both on brief), Bethesda, for respondent.

Stan M. Haynes and Rudolph L. Rose, Baltimore (Semmes, Bowen & Semmes, Baltimore, John Noble, Noble and Crow, P.A., Rockville, all on brief), for petitioners.

Argued before MURPHY, C.J., ELDRIDGE, RODOWSKY, McAULIFFE and CHASANOW, JJ., and CHARLES E. ORTH, Jr. and MARVIN H. SMITH, Associate Judges of the Court of Appeals (retired), Specially Assigned.

RODOWSKY, Judge.

This workers' compensation case concerns the scope of an employer's obligation to provide medical treatment and services under Maryland Code (1957, 1985 Repl.Vol.), Art. 101, § 37(a). The principal issues are whether the complainant, a quadriplegic, is entitled to a specially equipped van, to additional remodeling and enlarging of his residence, and to the cost of electricity consumed in powering certain appliances used by him. The Workmen's Compensation Commission denied all three requests; the Circuit Court for Montgomery County reversed, and the Court of Special Appeals affirmed that reversal. *R & T Constr. Co. v. Judge,* 82 Md.App. 700, 573 A.2d 96 (1990).

Section 37(a) provides in relevant part:

*"Employer to provide medical, etc., treatment and services.*—In addition to the compensation provided for herein the employer shall promptly provide for an injured employee, for such period as the nature of the injury may require, such medical, surgical or other attendance or treatment, nurse and hospital services, medicines, crutch-

es, apparatus, artificial hands, arms, feet and legs and other prosthetic appliances as may be required by the Commission...."

The claimant, Thomas Claude Judge (Judge), fell out of a third story window on October 28, 1981, while constructing townhouses in Gaithersburg, Maryland. The petitioner, R & T Construction Company (R & T), is a Virginia based corporation which was Judge's statutory employer at the time of the accident. The insurer is Maryland Casualty Company. Judge, who was born November 2, 1929, is a resident of Virginia.

As a result of the accidental injury, Judge is completely paralyzed from the neck down. He is confined to his bed or to his wheelchair. He is attended round-the-clock by nurses working one at a time, in shifts. Judge's paralysis includes his bladder, his bowels, and even the involuntary control of his blood vessels. As a result of the latter, his body cannot regulate its temperature. Judge is "ventilator-dependent," meaning that he is unable to breathe without the assistance of a machine, referred to as a "respirator" and as a "ventilator." Judge has at least two ventilators, a stationary one that sits by his bed, and a portable one that is carried on his wheelchair. His electrically powered, motorized, tiltable wheelchair is almost twenty-seven inches wide. Judge uses the wheelchair in a reclining position, in contrast with sitting upright in it.

Judge pursued workers' compensation in Virginia to an award against R & T rendered in February of 1982. He was sent to the Rocky Mountain Regional Spinal Injury Center located at Craig Hospital in Colorado, a nationally known facility specializing in the management and care of ventilator dependent quadriplegics. Judge's wife, Patricia Judge, was trained at Craig Hospital in caring for Judge. From the time of his release, Judge has lived with his wife at their detached residence in Dale City, Virginia.

In December 1982 the Supreme Court of Virginia held that under the Virginia workers' compensation statute the

employer's obligations for medical care and vocational rehabilitation did not include structural improvements to the residence of a paraplegic who was confined to a wheelchair. *Low Splint Coal Co. v. Bolling*, 224 Va. 400, 297 S.E.2d 665 (1982). The Virginia Industrial Commission relied on *Low Splint Coal Co.* to deny, in February 1983, an application by Judge for a specially modified van to be permanently situated at his home. The Virginia Industrial Commission concluded that the requested van was "not any form of necessary medical attention."

Effective July 1, 1983, the Virginia legislature authorized the Industrial Commission to require employers, where medically necessary, to furnish wheelchairs, lifts, adjustable beds, and modification of the claimant's principal home at a total cost not to exceed $10,000. *See* Va.Code Ann. § 65.1–88 (1980, 1984 Supp.). Judge applied to the Virginia Industrial Commission for further home modifications. Maryland Casualty Company had already expended nearly $9,500 for wheelchairs for Judge and $2,400 in home modifications, consisting of a ramp to the front door and the widening of certain doors. The Virginia Commission held in March 1984 that this statute was retroactive, so that the insurer had no further obligation under Virginia law.

Meanwhile, Judge filed a claim in October 1983 with the Maryland Workmen's Compensation Commission (the Commission) seeking a specially equipped van, payment of electric bills, and further modifications to his residence. That claim was held to be timely filed. *Judge v. R & T Constr. Co.*, 68 Md.App. 57, 509 A.2d 1236, *cert. denied*, 307 Md. 433, 514 A.2d 1211 (1986).

At the hearing before the Commission in this matter, Judge and his wife testified. Testimony of Judge's last witness, a rehabilitation consultant, was terminated by the Commissioner after counsel for Judge disclaimed a vocational rehabilitation theory and proffered the balance of the testimony would cover the psychological responses of quadriplegics. The Commission's award found that Judge was "not entitled to payment for increases in electric bills, a

van, and further modifications to his home pursuant to [§ 37]."

On appeal, the Circuit Court for Montgomery County at first ruled on motion that it would remand this case to the Commission. Then the circuit court reversed itself. That court and the parties interpreted the Commission's order to hold, as a matter of law, that § 37 did not encompass claims of the type asserted by Judge. The circuit court ruled, as a matter of law, that the types of claims that Judge was asserting could be cognizable under § 37.

This case thereafter was tried before a jury. Judge, his wife, a psychologist, an architect, and, by deposition, an orthopedic surgeon from Craig Hospital testified. Judge presented no evidence to particularize the cost of his claims.

The court submitted three issues to the jury, namely, whether Judge was entitled to each of the types of benefits sought. The jury was told that it must find that each "benefit is reasonable and necessary to cure or relieve illness or disability of the claimant caused by the work related injury." The jury answered yes to each issue.

The circuit court entered a judgment reversing the Commission and ordering this case remanded to the Commission "for the entry of an order consistent with this decision and for further proceedings required by this decision."

R & T and its insurer appealed to the Court of Special Appeals. In addition to raising the three issues described above, they also argued that the denials by the Virginia Industrial Commission of the benefits requested by Judge in the instant matter prevented, by operation of the Full Faith and Credit Clause, U.S. Const. art. IV, § 1, or under Maryland public policy, the Commission from awarding the same benefits.

On the issue of the scope of § 37 the Court of Special Appeals held that increased electrical costs were recoverable. It also held that

"given an appropriate factual predicate, § 37(a) may permit the ... Commission to order modifications to an

injured worker's home, as well as providing, for the use of the injured worker, a specially modified and equipped van. Indeed, we believe that the latter fits quite comfortably within the Maryland statute—as an 'other prosthetic appliance.' "

*R & T Constr. Co. v. Judge*, 82 Md.App. at 716, 573 A.2d at 103 (footnote omitted). R & T's full faith and credit argument was rejected.

We granted R & T's petition for certiorari, 321 Md. 46, 580 A.2d 1066. Additional facts will be stated as we address various issues in this opinion.

# I

■ We reject the full faith and credit argument advanced by R & T for the reasons given by the Court of Special Appeals in part 4 of its opinion. *R & T Constr. Co.*, 82 Md.App. at 722–26, 573 A.2d at 106–08.

R & T argues, however, that the Court of Special Appeals decided "the crucial constitutional issue ... without *any* consideration of the persuasiveness of the respective reasons supporting the various viewpoints on this issue." Reply Brief of Petitioners at 6.

The Supreme Court of the United States, and not this Court, is the final arbiter of the meaning and application of the Constitution of the United States. R & T's submission is that this Court should return to the rule of *Magnolia Petroleum Co. v. Hunt*, 320 U.S. 430, 64 S.Ct. 208, 88 L.Ed. 149 (1943), under which the orders of the Virginia Industrial Commission on the issues presented here would bar benefits under § 37(a) of the Maryland act. The *Magnolia* rule was severely limited in *Industrial Comm'n of Wisconsin v. McCartin*, 330 U.S. 622, 67 S.Ct. 886, 91 L.Ed. 1140 (1947), which held that "[o]nly some unmistakable language by a state legislature or judiciary would warrant" construing the award in the state where the employment contract was made as "completely exclusive [and] designed to preclude any recovery by proceedings brought in another state for

injuries received there...." *Id.* at 627–28, 67 S.Ct. at 889, 91 L.Ed. at 1143. In the Court's most recent venture into this field, *Thomas v. Washington Gas Light Co.*, 448 U.S. 261, 100 S.Ct. 2647, 65 L.Ed.2d 757 (1980), there was no majority opinion. Consequently, *McCartin* stands unreversed. Under *McCartin*, this Court is not obliged to give the Virginia orders full faith and credit.

As the Court of Special Appeals pointed out, absent a constitutional bar, Maryland does not prohibit supplementing the award made by one state with additional benefits available under the more liberal law of another state. *See Wood v. Aetna Casualty & Sur. Co.*, 260 Md. 651, 273 A.2d 125 (1971).

## II

The circuit court's ruling that § 37(a) includes the cost of the electricity to operate reasonably necessary medical equipment and apparatus will be affirmed. Judge's hospital bed and the stationary ventilator are electrically powered, as is a suction device used about every two hours to clear Judge's lungs. The batteries for his mechanized wheelchair and for the portable ventilator must be recharged daily. The physician from Craig Hospital testified that "[w]ithout these types of devices in place, Mr. Judge would die of respiratory complications or ... he would succumb to skin breakouts and other sores which would be detrimental to his medical condition."

Under the circumstances, the cost of electricity for Judge's medical equipment and apparatus, described above, does not appear to be de minimus. The problem here is not one of coverage by § 37(a), but of proof of the cost. If the parties are unable to agree on a system for determining electrical costs attributable to the running of this medical equipment, as contrasted with basic household expenses, the Commission will have to resolve the dispute.

The claimant has also referred to his lack of normal bodily temperature controls to support a claim for some

part of the cost of heating and air conditioning his residence, or at least, his room. The record shows that, when Judge is out of doors, his temperature must be monitored every two hours. That indicates some tolerance to temperature change. Currently the air conditioning is furnished by two window units, purchased by the insurer, that are located on the level of the house above that of Judge's bedroom. On this record the Commission could find that the air conditioning is medical treatment.

## III

Understanding the claim for modifications to the Judges' residence involves the relationship of Judge's catastrophic physical limitations to the home's present and potential layouts. To describe the home we shall assume that it faces south. Currently only Judge and his wife reside there.

The Judges' home is a two-story structure, set into terrain which slopes down from back to front. The rear of the first floor is below ground while the front entrance on the first floor is at grade. On the west side of the front lot is a driveway from which a ramp leads to the front door. The front door is at midpoint of the south wall. The door opens onto a foyer, three feet long measured from the south wall to the foot of stairs that go to the second level. To the east of the entrance is Judge's bedroom (11.5′ by 21.5′). Next to Judge's bedroom to the north, and along the north wall of the building is a utility room. Immediately west of the utility room is a full bathroom, separated on its south side from the back of the stairs by a corridor forty-two inches wide. The area west of the stairs from the front of the house to the back is a recreation room.

The doorways are twenty-seven inches wide between the foyer and Judge's bedroom, and between Judge's bedroom and the utility room, and between the utility room and the hall outside of the first floor bathroom. The door to that bathroom is twenty-one inches wide. That bathroom is too

small within which to maneuver the wheelchair, much less a gurney.

The second floor of the house has a living room-dining room area on the west side, a kitchen on the north side, opposite the head of the stairs, and three bedrooms and a full bathroom on the east side. There is an outside deck accessible through a sliding glass door in the north wall of the dining area.

The twenty-seven inch doorways barely accommodate the width of Judge's wheelchair. Pads on the arms of the chair scrape on the sides of those doorways. These pads have been replaced approximately every two years. To get through the front door to the ramp, it is necessary for Judge's attendant to push the wheelchair into the recreation room, open the front door which swings in toward Judge's bedroom, and then maneuver the wheelchair between the foot of the stairs and the south wall, as if parallel parking an automobile.

Judge's wheelchair is equipped with a "sip and puff" control. By breathing in and out Judge can direct the mechanized chair forward and backward, but, because of the close clearances, he cannot navigate the twenty-seven inch doorways or the front door by the sip and puff control.

Judge is sponge bathed in his hospital bed. He has a permanent catheter installed between his navel and pubic area. When he is in the wheelchair the catheter bag is attached to his leg. Otherwise, it hangs from his bed. His bowels must be digitally stimulated by his attendant in order for them to function. This process is conducted in his bed into a disposable receptacle. The attendant disposes of the stool in the bathroom.

Because the issue before the circuit court was viewed to be whether home modifications for the handicapped could ever be ordered under § 37, Judge never requested a specific modification and never estimated the cost of any particular modification. Instead, Judge's architectural witness described progressively more elaborate alterations and addi-

tions to the home, and then the physician from Craig Hospital commented on those proposals.

The architect discussed three options, A through C. The principal features of option A were to increase the foyer area to forty-nine square feet by extending a seven foot wide section of the south wall containing the front door four feet to the south. The first floor bathroom would also be enlarged and redesigned. Option B added to option A an extension of the driveway to the north side of the house and construction of a second wheelchair access entrance on the north side of the home directly to the second floor level. Option C added to options A and B the construction of an addition containing a commercial size elevator linking the first and second floor levels.[1]

The physician, Dr. Robert R. Menter, gave two reasons for enlarging the first floor bath. The first was to enable the attendant to give Judge a shower while he was lying on a gurney because "[w]e feel that the majority of the people in our country bathe with some form of bath or shower, and that [it] is appropriate for a disabled individual to have that type of similar bathing arrangement...." Secondly, an enlarged bathroom would permit the attendant to perform the bowel and bladder routine there while Judge was on a gurney. In that way "the contents are disposed of or the urine is drained, in the proximity to where the fluids and/or excreta are collected."

Dr. Menter did not testify specifically concerning modifications to the foyer. He did express his views, however, on the general subject of mobility in connection with the customized van issue.

" 'Q    ....

" 'Do you have an opinion, based upon a reasonable degree of medical certainty, as to whether Tom Judge is

---

**1.** In a written report the architect presented a fourth option. Recognizing the extent of the modifications presented as options A, B, and C, option D reviewed the advantages of building a new home elsewhere.

in need of a van modified for his uses for other transportation?

" 'A Yes, I do.

" 'Q What is that opinion?

" 'A I believe that an individual who has lost their mobility, their ability to interact in the community, needs the restoration of whatever mechanical assistance that we can provide to maintain their abilities to interact in the community, in whatever way they choose to maintain— involve their lives.' "

Dr. Menter also believed that Judge "should be allowed access to the primary living quarters of the family within their residence." By this he meant "the place where the members of the family would interact and carry out the majority of their activities. That involves, in almost all cases, the kitchen, the dining room, or the living room areas of the house."

### A

R & T argues that modifications to the residence of a paraplegic or quadriplegic fall outside of the scope of medical treatment or services under § 37. The majority of courts which have considered this issue do not take the absolute position espoused by R & T. Rather, under workers' compensation statutes with no more specificity than § 37's "medical ... or other attendance or treatment," courts have recognized an obligation, depending on the particular facts before them, for some form of modification to living quarters to allow persons in wheelchairs the essentials of everyday life. In reviewing these decisions we do not intend to indicate agreement with the extent of the holding in each case. The decisions are relevant because in each case the statute is not substantially different from § 37.

In 1987 the Commonwealth Court of Pennsylvania ordered the construction of a ramp and the widening of certain doorways in the home of a claimant who could walk

up to 200 feet on braces, but who otherwise used a wheelchair. *Rieger v. Workmen's Compensation Appeal Board*, 104 Pa.Commw. 42, 521 A.2d 84. The court said "that the intent of the Act is not that a claimant be forced either to rely upon the charity of his family and friends or to rely upon hired assistance in order to perform those daily tasks, duties, and business that he was previously able to perform, when a simple, inexpensive remedy is available at hand." *Id.* at 47, 521 A.2d at 87. *Bomboy v. Workmen's Compensation Appeal Board*, 132 Pa.Commw. 169, 572 A.2d 248 (1990), involved a paraplegic whose injury occurred in 1982, before *Rieger* was decided. The insurer in *Bomboy* paid for modification of the claimant's basement into a wheelchair accessible living space, with a bedroom and a bathroom. In 1988 the claimant sought additional modifications including an attached garage and a wheelchair lift, at a cost of up to $35,000. The court held that its prior *Rieger* decision did not extend to the requested, substantial modifications that were beyond those initially made to accommodate the claimant's wheelchair.

In *Langford v. William Rogers, Inc.*, 144 A.D.2d 785, 534 N.Y.S.2d 761 (1988), the court held that reasonable modifications needed to facilitate the use of a wheelchair fell within the concept of "other attendance or treatment," reasoning that if a wheelchair were necessary, modifications needed to facilitate the use of the appliance were also necessary.

The insurer in *Pine Bluff Parks & Recreation v. Porter*, 6 Ark.App. 154, 639 S.W.2d 363 (1982), did "not question its obligation to furnish ramps, rails, wheelchairs, widened doors, special commodes and shower facilities and other apparatus required by the" paraplegic claimant. *Id.* at 159, 639 S.W.2d at 366. The claimant, however, had arranged to rent an apartment in a building designed especially for persons with mobility impairment. The court ordered apportionment of the rent, with the insurer paying that portion which remained after excluding the cost of lodging and non-medical services, such as housekeeping.

A type of modular or mobile home, manufactured especially for persons using wheelchairs, has been awarded in two reported decisions. The use of such a home was ordered in *Peace River Elec. Corp. v. Choate,* 417 So.2d 831 (Fla.App.1982), where the insurer acknowledged that it was required to furnish some form of special housing accommodations. *Derebery v. Pitt County Fire Marshall,* 318 N.C. 192, 347 S.E.2d 814 (1986), involved a nineteen year old whose legs were paralyzed. The owner of the residential structure which the claimant's parents rented refused to permit modifications, including those to an entrance and to a bathroom. By a four to three decision, the court upheld an award of alternate housing for the claimant alone in a specially designed mobile home. One of the dissenting judges filed an opinion emphasizing, in part, that disability compensation is a substitute for lost wages that would be used to purchase shelter, among other things, and that only those special features of the new residence which were necessitated by the injury should be included as medical treatment.

In a Florida case the insurer successfully contended, on appeal, that its obligation to provide handicapped-equipped and wheelchair-accessible housing was satisfied by paying the difference between the rental of a specially designed apartment over the cost of the apartment occupied by the claimant prior to the injury. *See Ramada Inn South Airport v. Lamoureux,* 565 So.2d 376 (Fla.App.1990). In another Florida case, where the issue was modification of existing housing versus alternate housing, the court held that "[u]nless there is a specific reason that the existing home is totally inappropriate for modification, the [employer and insurer] should have the option of modifying the existing residence in conformance with the medically necessary requirements." *Polk County Bd. of Comm'rs v. Varnado,* 576 So.2d 833, 838 (Fla.App.1991).

Where a quadriplegic bought a house that was not "particularly difficult or expensive to modify as opposed to any other residence that [the insurer] might have found," the

insurer was obliged to modify. *See Terry Grantham Co. v. Industrial Comm'n,* 154 Ariz. 180, 183, 741 P.2d 313, 316 (1987). Precisely what modifications were involved for the quadriplegic claimant are not disclosed in the opinion.

The decision on which Judge places heaviest reliance is *Squeo v. Comfort Control Corp.,* 99 N.J. 588, 494 A.2d 313 (1985), involving a quadriplegic who was twenty-four at the time of the accident. Living in a nursing home with predominantly elderly patients, the claimant had become so severely depressed that he attempted suicide on three occasions. The compensation court ordered construction of a separate apartment attached to the claimant's parents' home, but not interconnected with it. The apartment was to be built to the standard of an apartment in either of two specified, independent living facilities located in New Jersey, with the claimant to pay any costs above that standard.[2] The court held that the testimony supported a holding that "the construction of the apartment addition was reasonable and necessary treatment to relieve Squeo of his severe mental depression." 99 N.J. at 605, 494 A.2d at 322.

At the other end of the spectrum are *Low Splint Coal Co. v. Bolling,* 224 Va. 400, 297 S.E.2d 665, discussed *supra,* and *Savaria v. DiSano,* 118 R.I. 357, 373 A.2d 820 (1977). The claimant in the latter case had no use of his legs and was barely able to move his arms. He lived in a second floor apartment and sought installation of an elevator or lift. The claimant's physician testified that the lift would make ingress and egress safer, but it would not improve the claimant's health. The request was held to be for convenience and not for medical purposes. *Cf. Zylbergleit v. Irving Rubber & Metal Co.,* 87 A.D.2d 929, 450 N.Y.S.2d 87 (1982) (electric elevator chair installed for access by compensable heart condition claimant to second floor apartment).

---

**2.** The effect was to place on the insurer the cost of basic housing, as well as of the special, additional features.

R & T submits that *ejusdem generis* prevents construing § 37(a) to include any home modifications. They are not, R & T argues, in the same class as "medical, surgical or other attendance or treatment, nurse and hospital services, medicines, crutches, apparatus, artificial hands, arms, feet and legs and other prosthetic appliances." R & T's reading is a narrow one. Article 101, § 63 provides that "[t]he rule that statutes in derogation of the common law are to be strictly construed shall have no application to this article." We have said that Art. 101 "should be construed as liberally in favor of injured employees as its provisions will permit in order to effectuate its benevolent purposes. Any uncertainty in the law should be resolved in favor of the claimant." *Howard County Ass'n for Retarded Citizens v. Walls*, 288 Md. 526, 530, 418 A.2d 1210, 1213 (1980).

The meaning of "nurse ... services" in § 37(a) was an issue in *A.G. Crunkleton Elec. Co. v. Barkdoll*, 227 Md. 364, 177 A.2d 252 (1962), where both of the claimant's arms had been amputated just below the shoulders as a result of the accidental injury. Because the words "nurse services" appear in an enumeration including "medical, surgical ... and hospital," *ejusdem generis* would indicate that only professional health care providers were intended. Yet, this Court said that "the word 'nurse' ... is a broad and comprehensive term and encompasses the care and attendance necessary in each case." *Id.* at 371, 177 A.2d at 256. We held that § 37(a) was not limited to services by registered nurses or by licensed practical nurses, but that, under the circumstances there, § 37(a) also included nursing services by the claimant's wife. Similarly, Art. 101, § 57 requires Commission approval of "compensation for legal services." In *Schauder v. Brager*, 303 Md. 140, 492 A.2d 630 (1985), we held that under § 57 the Commission was also "empowered to approve fees of physicians and others who evaluate a claimant in preparation for trial and who appear for a claimant at trial." *Id.* at 142, 492 A.2d at 631.

The wheelchair confined claimant who has had an established residence is denied access to traditional medical treat-

ment, under an implied circumstance of its rendition, if the home is not wheelchair accessible. The wheelchair is a medical "apparatus," and, without wheelchair accessibility, use of the apparatus is denied in the location where the General Assembly would expect the wheelchair most commonly to be used. Similarly, it is a medical necessity that the wheelchair bound claimant who could use a toilet without assistance have access to the bathroom of the home. We hold that § 37(a) includes within the concept of medical treatment reasonable modifications to a claimant's home that allow necessary access for claimants confined to wheelchairs as a result of their compensable injuries.

### B

It does not follow from the foregoing that Judge is entitled to have the insurer provide any of the home alterations which were described by his architect witness. Judge is bathed by his nurse and his bodily wastes are removed by the nurse. Judge's attendant can push his wheelchair out of his bedroom to the recreation room and maneuver the wheelchair out of the house. The insurer is already paying for Judge's being provided with those necessities, the absence of which would impair physical well-being.

We recognize that Judge's lifestyle would, to some degree, move closer to that of a person who is not so catastrophically disabled if he could, by the sip and puff control, operate his wheelchair throughout most of the lower level of his home and out the front door, if he could lie under a shower, if he could have the bowel and bladder routine performed in the bathroom, and if he could visit the second level of his house, as well as the first. Yet, if all of this remodeling were done, Judge would still need a full-time attendant. This highlights that the alterations proposed here would not make the residence suitable for the disabled person to be relatively self-sufficient, insofar as necessities are concerned. In this case the additional modifications involve the improvement of the quality of life for one in Judge's situation.

■ We further recognize that a body of professional and public opinion supports "mainstreaming," to the fullest extent possible, for severely disabled persons. We remain mindful that the act is to receive a liberal construction. Nevertheless, in the area of modifications to a residence, the concept of medical treatment under § 37(a) must be limited to access for necessities. Here the purpose of the possible improvements goes beyond the necessities already being provided, and seeks to give Judge a sense of increased independence and self-worth. Under the circumstances here that goal is beyond the process of construction of § 37(a). Were we to depart from the standard of access to necessaries that may be implied in medical treatment, there would be no statutory standard to guide the Commission in determining the extent of an insurer's obligation to make alterations to a claimant's residence. Consequently, on the issue of modifications to the Judges' home, the Commission reached the legally correct result.

## IV

■ The rationale for our holding concerning further modifications to the residence furnishes the answer to the issue involving a specially equipped van. The insurer currently transports Judge by van approximately once a week to Judge's physician. Measured by a standard of necessity, that weekly transport is the out-of-doors mobility equivalent of wheelchair access into, and within essential parts of, a home by one who is not as severely limited as is Judge. Increased mobility will certainly improve the quality of Judge's life, but a specially equipped van is not an "other prosthetic appliance[,]" as the Court of Special Appeals held.

2 A. Larson, *The Law of Workmen's Compensation* § 61.13(a), at 10–863 (1989) summarizes by saying that "[a]s to specially-equipped automobiles for paraplegics, the cases have uniformly denied reimbursement, on the ground that an automobile is simply not a medical apparatus or device." (Footnote omitted.) *See Aino's Custom Slip Covers v. DeLucia,* 533 So.2d 862 (Fla.App.1988); *Kranis v. Trunz,*

91 A.D.2d 765, 458 N.Y.S.2d 10 (1982); *DeCroix v. N. Sumergrade & Sons,* 20 A.D.2d 735, 246 N.Y.S.2d 852 (1964); *Carniato v. Foster Wheeler Corp.,* 7 A.D.2d 328, 183 N.Y.S.2d 298 (1959); *McDonald v. Brunswick Elec. Membership Corp.,* 77 N.C.App. 753, 336 S.E.2d 407 (1985); *Johnson v. Skelly Oil Co.,* 359 N.W.2d 130 (S.D.1984). *But see Terry Grantham Co. v. Industrial Comm'n,* 154 Ariz. 180, 741 P.2d 313 (Ariz.App.1987); *Edgewood Boy's Ranch Found. v. Robinson,* 451 So.2d 532 (Fla.App.1984).

JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED IN PART AND REVERSED IN PART. CASE REMANDED TO THE COURT OF SPECIAL AP-PEALS WITH INSTRUCTIONS TO AFFIRM IN PART AND REVERSE IN PART THE JUDGMENT OF THE CIRCUIT COURT FOR MONTGOMERY COUNTY AND TO REMAND THIS CASE TO THE CIRCUIT COURT FOR MONTGOMERY COUNTY FOR REMAND IN PART TO THE WORKMEN'S COMPENSATION COMMISSION, FOR FURTHER PROCEEDINGS IN ACCORDANCE WITH THIS OPINION. COSTS IN THIS COURT AND IN THE COURT OF SPECIAL APPEALS TO BE PAID ONE-HALF BY RESPONDENT, THOMAS CLAUDE JUDGE, AND ONE-HALF BY THE PETITIONERS, R & T CON-STRUCTION COMPANY AND MARYLAND CASUALTY COMPANY.