717 A.2d 919

MAYOR AND CITY COUNCIL OF BALTIMORE

v.

Joseph Charles SCHWING, Jr.

No. 83, Sept. Term, 1997.

Court of Appeals of Maryland.

Sept. 16, 1998.

Amaza S. Reid, Asst. Solicitor, Herbert Burgunder, Jr., Principal Counsel (Otho M. Thompson, City Solicitor; Frank C. Derr, Deputy City Solicitor, all on brief), Baltimore, for petitioner.

Harvey Greenberg (Law Offices of Harvey Greenberg), Towson, for respondent.

Argued before BELL, C.J., and ELDRIDGE, RODOWSKY, CHASANOW, RAKER, WILNER and CATHELL, JJ.

WILNER, Judge.

This case arises from an attempt by Joseph Schwing, a Baltimore City firefighter, to recover workers' compensation benefits for a disablement arising from his cardiovascular disease, which he contends qualifies as a compensable occupational disease under Maryland Code, §§ 9–101(g) and 9–502 of the Labor and Employment Article (1991 Repl. Vol). Baltimore City opposed his effort, principally on limitations grounds. We shall direct that the Workers' Compensation Commission conduct further proceedings with respect to Mr. Schwing's March, 1994 claim. To reach that result, we shall

revisit and overrule our holding in *Waskiewicz v. General Motors Corp.*, 342 Md. 699, 679 A.2d 1094 (1996).

To understand the issues raised in this case, it is necessary, at the outset, to review briefly some of the statutes governing compensation for occupational diseases. We start with the definition of "occupational disease"set forth in § 9–101(g): an occupational disease is "a disease contracted by a covered employee (1) as the result of and in the course of employment; and (2) that causes the covered employee to become temporarily or permanently, partially or totally incapacitated." The word "incapacitated" is not defined in the statute.

The right to compensation for an occupational disease is provided for in § 9–502. Section 9–502(c) requires an employer, generally, to provide compensation to a covered employee "for *disability* of the covered employee resulting from an occupational disease." (Emphasis added). Section 9–502(d) provides an exception to that liability, however, intended to assure that the occupational disease for which compensation is claimed really did arise from the employment by the employer sought to be held liable. The employer is liable only if:

"(1) the occupational disease that caused the death or disability:

(i) is due to the nature of an employment in which hazards of the occupational disease exist and the covered employee was employed before the date of *disablement;* or

(ii) has manifestations that are consistent with those known to result from exposure to a biological, chemical, or physical agent that is attributable to the type of employment in which the covered employee was employed before the date of disablement; and

(2) on the weight of the evidence, it reasonably may be concluded that the occupational disease was incurred as a result of the employment of the covered employee."

(Emphasis added.)

The term "disability" is not defined, in either the general definition section (§ 9–101) or in § 9–502. For purposes of § 9–502(d), "disablement" is defined as "the event of a covered

employee becoming partially or totally incapacitated: (1) because of an occupational disease; and (2) from performing the work of the covered employee in the last occupation in which the covered employee was injuriously exposed to the hazards of the occupational disease." § 9–502(a). The only place in § 9–502 that the defined term "disablement" appears is in § 9–502(d)(1).

The limitations of § 9–502(d) are modified to some extent by § 9–503. Section 9–503(a) provides, in relevant part, that a paid firefighter employed by a county "is presumed to have an occupational disease that was suffered in the line of duty and is compensable under this title" if the individual has "heart disease" and that heart disease results in partial or total disability or death. The issues raisable under § 9–502(d) may still be raised, of course, with respect to a firefighter having a heart disease, but, in light of the presumption in § 9–503, the employer has a heavy burden of producing sufficient evidence to persuade the Commission and any reviewing court that the heart disease did not arise from an occupational disease. *Montgomery Co. Fire Bd. v. Fisher*, 298 Md. 245, 468 A.2d 625 (1983).

Those are the principal substantive statutes, defining and limiting the right to compensation for occupational disease. The statutes most particularly at issue here are §§ 9–711 and 9–736, setting forth certain time requirements for filing new claims and requests to reopen and modify adjudicated claims. Section 9–711 requires that, if a covered employee suffers "a disablement" as a result of an occupational disease, the employee must file a claim with the Commission within two years after the date (1) of disablement, or (2) when the employee first had actual knowledge that the disablement was caused by the employment. Unlike in § 9–502, neither the term "disablement" nor the term "date of disablement" is defined in, or for the purpose of, § 9–711. Disablement has been held to be the equivalent of incapacitation. *Helinski v. C & P Telephone Co.*, 108 Md.App. 461, 471, 672 A.2d 155, 160 (1996).[1]

---

1. It is unfortunate that the statutes relating to compensation for occupational disease use the different terms "incapacitated," "disability,"

Section 9–736 gives the Commission broad continuing jurisdiction to terminate or adjust compensation payments if an aggravation, diminution, or termination of disability takes place or is discovered "after the rate of compensation is set." Section 9–736(b)(3), however, provides, with an exception not relevant here, that "the Commission may not modify an award unless the modification is applied for within 5 years after the last compensation payment."

In essence, the admixture of these statutes requires that a covered employee seeking compensation for an occupational disease (1) establish, through evidence or, if applicable, through the presumption created in § 9–503, that he or she has a compensable occupational disease, (2) file a claim with the Commission within the two-year period set forth in § 9–711, and (3) if the employee seeks to reopen a claim because of an aggravation of disability, apply for a modification within the five-year period established in § 9–736(b)(3). With this background, we may turn to the facts of this case.

## PROCEDURAL HISTORY

Joseph Schwing became a firefighter for Baltimore City in 1963. On December 1, 1982, at the age of 42, he experienced a 15–minute bout of chest pains. He initially treated the problem with aspirin, but the next day he was admitted to Franklin Square Hospital. While there, he again developed chest pain, accompanied by nausea, and was diagnosed as having had a non-transmural myocardial infarction. His cardiologist, Dr. Rudikoff's, impression was "Coronary artery disease, S/P posterior wall and nontransmural inferior wall MI 12–2–82, dysnea, class 2." Mr. Schwing was released from the hospital on December 14, 1982, and returned to work on or about February 6, 1983. He was first placed on light duty, but eventually he resumed his full duties.

----

and "disablement" without any clear indication of whether those terms are intended to be synonymous or, if not, what the distinctions are among them.

In July, 1983, Mr. Schwing returned to Franklin Square for a cardiac catheterization which, according to Dr. Rudikoff, "showed a 70% lesion of a small circumflex marginal but only minor disease in the remainder of the coronary tree except for a small right posterior descending. [The] large right posterior descending circumflex and LAD [left anterior descending] were all normal." Due to the catheterization, Schwing was off from work from July 12 to July 15, 1983. No surgery was deemed necessary, and Schwing lost no other time from work. In accordance with the collective bargaining agreement between the City and the firefighters' union, Schwing continued to receive his regular salary during the period he was off from work, and all of his medical expenses were paid through a Blue Cross/Blue Shield policy provided by the City as part of Schwing's compensation package.

On May 23, 1983—prior to the catheterization—Schwing filed a claim for worker's compensation benefits due to his heart attack. We shall refer to that claim as Claim A. Schwing asserted that December 3 was the first day he was unable to work and that he performed no work during his "period of disability." The City impleaded the Subsequent Injury Fund and filed a number of Issues, among them being whether Schwing was "disabled from performing his work and did he incur loss of wages," what percentage, if any, of his "alleged disease, condition or impairment, pre-existed [his] present disease, condition or impairment," and whether his disease, condition, or impairment was attributable to and was incurred in Schwing's employment. On June 21, the Subsequent Injury Fund also filed Issues, including whether Schwing sustained any compensable occupational disease, what the date of disablement was, and what portion of Schwing's alleged disability was due to the alleged occupational disease and what portion was due to any previous permanent impairment. Contemporaneously with its filing of Issues, the Fund informed the Commission and counsel that it had no information regarding any preexisting impairment for which the Fund might be liable and, unless medical records and

reports were submitted, it would be necessary to have live medical testimony.

The Commission responded immediately. On June 21—the same day it received the Fund's communication—it sent a Notice to all parties requiring that certain documents and information be supplied to the Fund within 20 days and advising that the case would not be scheduled for a hearing until the parties filed a stipulation (1) that the information had been supplied, (2) stating an estimate of the time necessary to try the case, and (3) stating the number of witnesses to be called. It is not clear whether any of the information sought by the Fund was supplied; nor does it appear that the required stipulation was filed. It *is* clear that no further proceedings were ever conducted with respect to Claim A. There was no hearing; there was no resolution of any of the Issues filed by the City or by the Fund; there was no determination by the Commission of whether Schwing suffered a disablement from an occupational disease; there was no award; and no benefits were paid pursuant to any order of the Commission.

From 1983 onward, Schwing's coronary condition was followed by Dr. Rudikoff and was treated with medications, and for about 10 years it remained stable. Schwing continued to perform his regular duties as a firefighter and returned to normal social and recreational activities, including walking, riding an exercise bicycle, and weight lifting. Entries by Dr. Rudikoff in Schwing's medical records through 1992 reveal him to be in generally good health and asymptomatic. In December, 1989, his general health was recorded as "excellent." Although reports of hypertension and borderline blood sugar began to appear, as late as November, 1992, he was "generally feeling well" and was free of chest pain or dyspnea.

In April, 1993, Mr. Schwing's brother died suddenly, of a heart attack. There are reports in various medical records that Mr. Schwing was quite upset, that for several weeks he suffered from headaches, had a poor appetite, and had difficulty sleeping, and that he experienced several episodes of tight-

ness in the chest, radiating to the left arm, shoulder, and neck. In May, a scheduled thalium stress test was postponed because of concern that he may have suffered another myocardial infarction in April. When eventually conducted, on October 27, 1993, the test established the likelihood of an occlusion of both the left anterior descending and the right coronary artery and a major question regarding total perfusion to the myocardium and relative degrees of stenosis and collateralization to the zones of ischemia. A catheterization was recommended. That procedure took place on December 9, 1993, and revealed "major coronary artery disease and mild impairment of left ventricular function." The doctor conducting the test recommended coronary bypass surgery "to his LAD diagonal, the left anterior descending if the distal portion of its [sic] turns out to have a large enough caliber to get into, the second circumflex marginal, and probably the right coronary artery . . . ." That surgery—a quadruple coronary artery bypass graft—occurred on December 16, at Sinai Hospital. Mr. Schwing was in the hospital for a week and remained off of work from December 9 to February 24, 1994. As before, he continued to receive his regular salary during the time he was absent from work.

On March 10, 1994, Mr. Schwing filed a worker's compensation claim (Claim B), asserting an occupational disease consisting of "artery blockage and heart damage from infarctions cardiovascular disease." On the claim form, Schwing alleged that the date of disablement was December 9, 1993 and asserted that that claim was the only worker's compensation claim he had filed for that occupational disease. As it had done with respect to the 1983 claim, the City impleaded the Fund and filed a number of Issues, including whether Schwing had a compensable occupational disease, whether he filed his claim within two years, as required by § 9–711, and whether any portion of his impairment arose from a preexisting condition.

On July 25, 1994, the Commission held a hearing on Claim B. Although some medical records were before the Commissioner, no other evidence was presented. Schwing contended

that the 1994 claim was a new one based on a cardiovascular disease that had developed slowly and insidiously since 1983, and that the 1982 infarction had "nothing to do with the cardiovascular disease that has been developing over the course of time for which he had his quadruple bypass and for which he had a second myocardial infarction recently...." The City urged that the 1993 episode was merely a worsening of the condition that Mr. Schwing had in 1982–83 and that all that the City was responsible for was continuing medical care based on Claim A. The Commissioner, applying his layman's knowledge, agreed with the City's position: [2]

> "As a layman my understanding of myocardial infarction is it's the result of the cardiovascular disease. In other words, cardiovascular disease was present in 1983 or he wouldn't have had the myocardial infarction at that time. That's my lay understanding of ... cardiovascular disease/myocardial infarction, the ultimate result....
>
> For the record, I'm saying it's not a new claim. It's not a new claim, but it's just a worsening of the condition that he had in 1982."

On that basis, the Commissioner entered an order disallowing Claim B on the ground that it was barred by limitations. It is not clear whether the order was based on § 9–711 or § 9–736.

Schwing filed a petition for judicial review in the Circuit Court for Baltimore City. The City responded with a motion for summary judgment, contending that "[t]he evidence at the hearing [before the Commission] was undisputed that the Claimant filed two separate claims for the same heart disease" and that the claim was barred by § 9–711. Schwing, in his answer, denied the allegation that he had filed two separate claims for the same heart disease and thus disputed that Claim B was barred by limitations. While those proceedings

---

**2.** Section 9–308 of the Labor and Employment Article authorizes any Commissioner to conduct a hearing for the Commission and provides that a decision or order of a Commissioner shall be considered a decision or order of the Commission.

were pending, this Court decided *Waskiewicz v. General Motors Corp.*, 342 Md. 699, 679 A.2d 1094 (1996). We shall discuss that case later in this Opinion. Suffice it here to say that we held in *Waskiewicz* that (1) an employee who suffers a disablement from an occupational disease and who obtains a workers' compensation award for that disablement may not pursue a new and separate claim based on an aggravation of the disablement due to subsequent injurious exposure to occupational hazards that produced the earlier disablement, (2) the employee's remedy in that situation is to request a reopening or modification of the previous or existing award, but (3) by virtue of § 9–736(b)(3), such a request must be filed within five years after the last compensation payment. That case, not surprisingly, was prominently mentioned by the parties and the court.

The court, through Judge Byrnes, denied the City's motion, without a hearing. He viewed the City's position as being that "because Schwing filed an initial claim for benefits in 1983, he cannot file a new claim in 1994 *for an aggravation of the same condition.*" (Emphasis added.) Schwing, in response, asserted that, because he was able to continue his employment and was paid his regular wages, no disablement existed in 1983, that his claim was therefore not related to the 1983 claim, and, accordingly, it was not barred by the twoyear statute of limitations set forth in § 9–711. *Waskiewicz,* he contended, was distinguishable in that he never received or claimed any benefits in 1983.

The court concluded that Schwing did, indeed, suffer a disability as a result of an occupational disease in 1983, and that he filed a claim for benefits for that disability within two years (Claim A). Nonetheless, Judge Byrnes ruled that there was a dispute of fact as to whether Schwing ever "claimed" any benefits at that time. He observed, in that regard, that "[w]hile both parties agree that his compensation for lost wages came from a labor agreement and not an award by the Commission, both parties disagree as to the source of his payments for medical expenses." At the time, that conclusion had a reasonable basis; the City had been unwilling to con-

cede that Schwing's medical expenses were paid through the insurance policy. As a result, Judge Byrnes concluded, "a factual dispute exists as to whether Schwing claimed any benefits within the meaning of *Waskiewicz*" and summary judgment would be premature.

Neither party accepted that approach. A week after Judge Byrnes filed his memorandum opinion, Schwing filed a motion for summary judgment, urging that the limitations issue was purely a legal one, as to which no material facts were in dispute. He iterated that there never was a finding of disability with respect to the 1982–83 episode and that no benefits were ever paid pursuant to that claim. In an accompanying affidavit, he averred that all charges for hospital services provided by Franklin Square Hospital, with respect to both his initial admission and the later catheterization, all charges for services provided by Sinai Hospital with respect to the bypass operation, and all of Dr. Rudikoff's bills were submitted to and paid by Blue Cross/Blue Shield—the insurance provided by the City as part of his compensation package. The City filed a cross-motion for summary judgment and an answer denying the allegations in Schwing's motion. Although it did not present any affidavit or other evidence contesting Schwing's sworn statement that all medical expenses connected with the 1982–83 episode or condition were paid by Blue Cross/Blue Shield, it repeated its allegations, which it asserted were undisputed, that (1) Schwing had "filed two separate claims for the same heart disease," (2) Schwing was unable to perform his duties as a firefighter because of his heart condition from December 2, 1982 through February 3, 1983, and from July 12—15, 1983, and (3) Schwing knew in 1983 that his heart condition was caused by his employment. For those reasons, it again urged that Claim B was barred by § 9–711, and it asked for a hearing.

At a hearing held by Judge Heller on the cross-motions, the City finally acknowledged that, in 1982–83, Schwing's wages were continued pursuant to the collective bargaining agreement and all of his medical and hospital expenses were paid by

Blue Cross/Blue Shield.[3] It was undisputed that no findings or order had ever been entered with respect to Claim A. The problem seemed to be in defining the theory on which Claim B could proceed. Schwing's position was that, as no order had ever been entered with respect to Claim A, there was no finding of disability then and therefore nothing to modify, and that, accordingly, Claim B had to be regarded as a new claim based on a disability arising in 1993. He disagreed with Judge Byrnes's approach that it was Claim A, which was filed within two years after the 1982–83 episode, that should be pursued, contending that there simply was no disablement in 1982–83.

The City insisted that it was Claim A that had to be pursued at the Commission level and that, among other things, the Commission would have to determine whether any attempt to recover benefits based on Schwing's 1993–94 condition would be barred by § 9–736. The Commission would need to consider whether the payment of wages and medical expenses by the City, either directly or through its employees' health insurance policy, constituted payments in lieu of worker's compensation benefits, to which § 9–736 would apply. The City urged that the Commission could find now that the 1982–83 episode constituted a disablement even if no such determination was made when Claim A was first filed. In its view, there could be only one date of disablement, and that had to be in 1982.

---

**3.** In the record is a document that appears to be an excerpt (Article XXXII) from the City's collective bargaining agreement with the firefighters' union. It provides, in relevant part, that if a member of the Fire Department becomes disabled while in the discharge of his duties, so as to prevent him from attending to his duties, he shall, for up to 12 months, receive his usual salary. It provides further that "[n]o employee shall be entitled to receive Workmen's Compensation benefits for temporary total disability during the time, or covering the period, that said employee is receiving his or her full salary for job injury leave as outlined above." It is not clear how or when that document was presented to the court. It is not marked as an exhibit and is not referred to in any of the motions or responses or in the arguments of counsel. Presumably, it was submitted to and considered by the court in connection with the cross-motions for summary judgment.

After hearing argument, Judge Heller announced a ruling from the bench, reserving the right "to make non-substantive, editorial changes." She first adopted the findings of fact set forth in Judge Byrnes's memorandum opinion. She then added that, had any workers' compensation benefits been paid in 1982–83, they would have been in addition to, and not in substitution for, the wage continuation and health insurance benefits Schwing received by virtue of the collective bargaining agreement. She concluded that his heart condition that existed in 1982 "deteriorated" and that "this heart condition" was an occupational disease. Following the approach taken by Judge Byrnes, Judge Heller concluded that Claim B was barred by the two-year statute of limitations stated in § 9–711, but that Claim A, which was filed within two years after his 1982–83 disablement, was not barred. Because no award had been made with respect to Claim A and there was nothing, therefore, to modify, neither § 9–736 nor *Waskiewicz* was applicable to Claim A.

In accordance with that view, Judge Heller said that she would direct that the case be remanded to the Commission "for it to consider the claim that was filed" in 1982–83, "to see if, indeed, he is entitled to an award." The next day—September 27, 1996—she signed an order, "for the reasons stated on the record in Court on September 26, 1996," sustaining in part and vacating in part the Commission's order of July 27, 1994, remanding the case for the Commission to determine "what, if any, Worker's Compensation benefits [Schwing] is entitled by virtue of [Claim A]," and declaring that Claim A "is not time-barred by Section 9–736 . . . ." Both parties filed a notice of appeal—the City on October 9, and Schwing on October 17.

On December 17, 1996, while these appeals were pending in the Court of Special Appeals, Judge Heller filed a "Memorandum Opinion Addendum," in which she concluded that Claim B was *not* time-barred. She held that, although Schwing "was first diagnosed with an occupational disease, cardio-vascular disease, in 1982," he had "no incapacity to do his job and was not disabled at that time" and did not become disabled until

December, 1993, when he had the bypass surgery. The disablement occurred then, and his Claim B was therefore timely. Accordingly, Judge Heller concluded that if, for the reasons stated in her original opinion from the bench, the Commission decided that Schwing was incapacitated in 1982–83, he should be permitted to pursue Claim A, but if, on the other hand, the Commission decided that his disablement did not occur until December, 1993, he should be permitted to pursue Claim B, which "is not barred by the statute of limitations."

The City moved the court to withdraw the Memorandum Opinion Addendum, on the ground that the court had no jurisdiction over the matter, (1) in light of the appeals that had been noted, and (2) in the absence of any showing of fraud, mistake, or irregularity in the judgment, more than 30 days having elapsed since the judgment was entered. That motion was denied, but no appeal was noted from the denial.

In their cross-appeals, the parties presented essentially three issues, though each worded them somewhat differently: whether the Circuit Court had jurisdiction to decide whether Claim A was barred by the limitations provision in § 9–736; whether it had jurisdiction to file its Memorandum Opinion Addendum, in which it reversed its earlier determination that Claim B was barred by the limitations provision in § 9–711; and whether it correctly concluded in its initial bench opinion that Claim B was barred by limitations. The appellate court answered the first and third questions in the negative and decided that it was unnecessary to address the second. *Mayor & City Council v. Schwing,* 116 Md.App. 404, 696 A.2d 511 (1997). The proceeding before the Commission, the court noted, concerned only Claim B; no attempt was made by Schwing to reopen Claim A, and thus no ruling was ever made by the Commission with respect to Claim A or its reopening. The City's defense was that Claim B was barred by § 9–711, and that, presumably, was the only basis of the Commission's order for which judicial review was sought. The issue of whether a reopening of Claim A was barred by § 9–736 was simply not before the Circuit Court. The only issues before

the appellate court, it determined, were whether Schwing suffered a disability in 1993 that was compensable under § 9–502(c) and, if so, whether a claim for that disability—Claim B—was barred by § 9–711. Whether Schwing suffered a disablement in 1983 was relevant only in that regard.

Noting the fact that Schwing was hospitalized and out of work by virtue of his infarction in 1982, the court held, as a matter of law, that he suffered a temporary total disability and incapacitation in 1982–83. The fact that he was able to return to work and eventually resume his normal duties was of no consequence in that regard, it said; nor was the fact that he suffered no wage loss. Because Schwing filed Claim A within two years after that incapacitation and because he filed Claim B within two years after his 1993 incapacitation, the court concluded that § 9–711 was not a bar to either claim. The only barrier to the prosecution of Claim B, it then said, was § 9–736, not in the sense that § 9–736 might apply directly to Claim B but rather because "the *enactment* of L.E. § 9–736 may indicate by itself that the General Assembly intended that neither the escalation of a temporary total to a permanent disability, nor a second temporary total disability, be a separately compensable 'disablement' under L.E. § 9–502." *Schwing, supra,* 116 Md.App. at 421, 696 A.2d at 519. The court went on to hold that temporary total and permanent disablements were separately compensable conditions, as were two or more temporary total disabilities, even if they arose from the same occupational disease. If compensation had been paid on Claim A, the court agreed, Claim B would be barred, but there was nothing to indicate "that the enactment of L.E. § 9–736 evinces an intent on the part of the General Assembly to bar a claim based upon a permanent partial or temporary total disability, when no award was made or compensation payments made on a previous claim for a temporary total disability suffered as a result of the same occupational disease as the second claim." *Id.* at 431–32, 696 A.2d at 524.

Because no compensation was paid for either a temporary total disability or any permanent partial disability suffered by Schwing in 1982–83, the court held that Claim B, which was

for a different disability, though arising out of the same occupational disease, was not barred by § 9–736. It therefore reversed that aspect of the judgment entered by the Circuit Court and directed that the case be remanded to the Commission for consideration of Claim B. Judge Bloom dissented. He agreed that, because no compensation payments had been made on the 1983 Claim, § 9–736 had no application. He disagreed with the majority's conclusion that Claim B was not barred by § 9–711, however, rejecting the notion that the same occupational disease can produce two (or more) separate compensable disabilities. *Id.* at 440–42, 696 A.2d at 528–29.

We granted the City's petition for *certiorari* to consider whether § 9–711 "bars a new claim based on a disability arising from the same occupational disease that caused a compensable disablement more than 2 years prior to the filing of the new claim but for which no permanent partial benefits have been received." We shall affirm the judgment of the Court of Special Appeals, but for different reasons.

## DISCUSSION

### A. *Claim A*

As a preliminary matter, we agree entirely with the Court of Special Appeals that the issue of whether a petition to reopen Claim A would be barred by § 9–736(b)(3) was not before the Commission or the Circuit Court. The proceeding before the Commission on July 25, 1994, and the Commission's order of July 27, 1994, dealt only with Claim B. It was that claim that was designated in the order, and it was that claim alone that was declared barred by limitations. The petition for judicial review, which unfortunately is not included in the record before us, could relate only to that claim. No request to reopen Claim A was ever made or presented to the Commission; accordingly, whether such a request could or could not properly be filed was never ruled upon by the Commission and should not have been ruled upon by the Circuit Court. That part of the Circuit Court's order of September 27, 1996 declaring that Claim A is not time-barred by § 9–736 and

remanding that claim to the Commission was properly reversed, not because the decision was necessarily wrong, but because it should not have been made.

### B. *Waskiewicz*

As noted, much of the controversy concerning Claim B arises from this Court's decision in *Waskiewicz v. General Motors Corp., supra,* 342 Md. 699, 679 A.2d 1094, and it is therefore appropriate to begin with that case.

In 1973, Mr. Waskiewicz developed carpal tunnel syndrome in both arms as a result of repetitive motion work on a factory assembly line. After undergoing surgery for that condition, he filed a Workers' Compensation claim based on an occupational disease. In an order entered April 21, 1976, the Commission found that Waskiewicz had sustained an occupational disease and suffered both a temporary total and a permanent partial disability; the permanent disability was rated as a 15% loss of use of both hands. Waskiewicz received continuing treatment for his condition, including additional surgeries in 1976, 1983, 1986, 1987, 1988, and 1989. In 1987, as a result of his pain and the aggravation of his carpal tunnel syndrome, GM took him off the assembly line and placed him on light duty, involving no use of power tools or heavy lifting. In 1991, his physician recommended further restrictions on his work duties, including no lifting, no repetitive motion, and no use of air guns. At some point, however, despite that recommendation, GM put Waskiewicz back on the assembly line, and as a result of that, his carpal tunnel syndrome worsened in both hands. In March, 1992, his doctor recommended that he not return to work, and he apparently did not do so.

In August, 1992, Waskiewicz filed a new claim for benefits, alleging a disability based on carpal tunnel syndrome beginning March 3, 1992. He did not seek to reopen the 1973 claim. The Commission denied the claim, apparently on the ground that Waskiewicz's condition was not a new occupational disease. Although the Circuit Court, on judicial review, reversed that determination, the Court of Special Appeals effectively reinstated it, concluding that his existing injury was

an aggravation of the 1973 disability rather than a new disablement. The only prospect of compensation, it concluded, would be through a reopening of the 1973 claim, but that was barred by § 9–736(b)(3).

We took the case to consider whether "a *new* workers' compensation claim, rather than a request for modification of an existing award, can be based on an additional injurious *exposure* to hazards aggravating the existing disability resulting from occupational disease," and, in a 4–3 decision, answered that question in the negative. *Id.* at 704, 679 A.2d at 1097.

Mr. Waskiewicz looked to the definition of "date of disablement" in § 9–502(a) as supporting his view that the worsening of any existing disability caused by an additional injurious exposure can support a new claim, and not just the modification of an existing one. The Court rejected that approach, holding instead that "disablement," as used in § 9–502, was a "singular 'event' of becoming partially or totally incapacitated because of an occupational disease, not as a series of exposures to the hazards of the same disease." *Id.* at 706, 679 A.2d at 1098. Allowing new claims for each exposure after the date of disablement, we said, would render § 9–502(c) meaningless, "because one could never pinpoint the compensable event of 'disability.' " *Id.* at 707, 679 A.2d at 1098.

Apart from disagreeing with his literal construction of § 9–502, the Court concluded that, if the General Assembly intended the result asserted by Mr. Waskiewicz, it would not have enacted the reopening provisions of § 9–736, giving the Commission broad jurisdiction to modify existing awards, subject to the five-year statute of limitations stated in that section. Citing *Stevens v. Rite–Aid Corp.,* 340 Md. 555, 565 n. 11, 667 A.2d 642, 647 n. 11 (1995), the Court observed that the reopening provision exists "for situations in which a claimant's condition degenerates, entitling the claimant to increased benefits," which was essentially Mr. Waskiewicz's situation. We rejected the argument that a new disability arose from the replacement of Mr. Waskiewicz on the assembly line, noting

that, had he remained continually in that job, his remedy for the worsened condition would have been a reopening under § 9–736, not a new claim under § 9–502. Building from the premise that a "disablement" was a "singular event," the Court was unwilling to draw any distinction between the situation of a disablement arising from an occupational disease that worsens on its own, by a natural progression of the disease, and one in which the disablement is aggravated by a new exposure, even if, but for the preexisting disablement, a compensable occupational disease could be found to have arisen from that new exposure. In both situations, the Court held, the employee was left to the remedy under § 9–736—a reopening of the initial award.

Though recognizing "some seeming unfairness" in the result of that analysis, the Court nonetheless concluded that, for Waskiewicz to prevail, it would have to hold that his removal from the assembly line and later reexposure constituted a new compensable event not recognized in the statute.

As noted, Waskiewicz was a 4–3 decision. The dissenters, led by Judge Chasanow, stressed what they regarded as the obvious, not just the seeming, unfairness of limiting a claimant solely to the reopening provision of § 9–736 when, by virtue of the five-year statute of limitations applicable to that remedy, a claim based on new exposures to workplace hazards that did not even arise until after the five-year period had run would nonetheless be barred, and they complained that such a construction, at the very least, ran afoul of the Legislature's mandate that the workers' compensation law be construed liberally in favor of claimants. They expressed the belief that the General Assembly intended to allow workers who suffered a partial disability as the result of an occupational disease to recover "for any increased disability resulting not from a natural progression of the disease but from a *new exposure* to employment hazards." *Waskiewicz, supra,* 342 Md. at 718, 679 A.2d at 1103–04. More specifically, the dissenters opined that, if the increase in disability occurs within the five-year period allowed under § 9–736, the employee may file for a reopening under that section, but that if "there is an additional

work-induced increase in the disability that occurs more than five years after the last payment, the worker should be allowed to file a new claim for benefits for the additional disability under § 9–656 or § 9–802." *Id.* at 718, 679 A.2d at 1104. They viewed those sections as providing for compensation when an employee becomes permanently disabled due partly to a preexisting disease and partly to a subsequent occupational disease, the compensation to be only for the portion of the disability attributable to the occupational disease. Observing that the majority opinion cited no out-of-State cases, Judge Chasanow called attention to *Mikitka v. Johns–Manville Products Corp.*, 139 N.J.Super. 66, 352 A.2d 591 (App.Div.1976), reaching a conclusion contrary to the majority position.

Both the Circuit Court and the Court of Special Appeals attempted in this case to avoid the consequences of *Waskiewicz*, for they would be as harsh to Mr. Schwing as they were to Mr. Waskiewicz. If the holding and reasoning in *Waskiewicz* are applied here, Schwing, like Waskiewicz, will be barred by limitations from asserting a claim based on new exposures to workplace hazards that did not even arise until long after the period of limitations had run. There are, indeed, some distinctions that can be drawn between this case and *Waskiewicz*—although not those drawn by the two lower courts—but, notwithstanding that the case is only two years old, we think it appropriate to take another look at *Waskiewicz* itself. Our review convinces us that the Court reached the wrong result in that case, and that the true answer lies closer to the position of the dissent.

We observe, by way of introduction, that the position taken in *Waskiewicz* is not only unsupported by any out-of-State case law that we could find but is, in fact, contrary to the position taken in a number of other States. Professor Larson draws a general distinction between complications that develop directly from the original injury, as to which the claimant's remedy lies with the reopening statute and is subject to the limitations period stated therein, and the situation where there is no causal relation between the first injury and the subse-

quent condition, as to which "reopening is obviously not the appropriate remedy." 8 A. Larson, LARSON'S WORKERS' COMPENSATION LAW, § 81.31(b). That certainly would apply where the employee contracts two separate occupational diseases. It has never been suggested, for example, that an employee could not contract two different occupational diseases and be entitled to compensation for both. If an employee suffers a disablement from asbestosis, for example, leading to either a temporary total or a permanent partial disability, but returns to work and then, through repeated exposures at the job site, suffers a disablement from carpal tunnel syndrome, there would seem to be no reason why the employee could not file a new claim for the carpal tunnel syndrome disablement, subject, of course, to any apportionment provisions. The employee's remedy in that situation would ordinarily not be a reopening of the asbestosis case. The notion of a disablement being a "singular event" thus needs to be viewed in context, and is not absolute.

The dissent in *Waskiewicz* mentioned *Mikitka v. Johns–Manville Products Corp., supra,* 139 N.J.Super. 66, 352 A.2d 591, as reaching a result contrary to that reached by the majority. In 1967, the employee in that case was awarded a 7 1/2% partial permanent disability for asbestosis. She continued her employment until she retired in 1970. In 1973, she filed a new claim, alleging an increase in her disability resulting from continued exposure after the 1967 award. It was unclear whether her new disability resulted from asbestosis or chronic bronchitis, and no finding was made in that regard. The claim was dismissed on limitations grounds, as not having been filed within two years after her last exposure or one year after she knew or should have known of the nature of her disability and its causal relation to her employment.

Before reaching that limitations issue, the New Jersey court made clear that the limitations provision in the reopening statute—two years after the last payment of compensation—was inapplicable, and therein lies the relevance of the case. The court noted that Mikitka's claim was not one for increased disability "stemming from the same exposure as was the basis

of the original award" but rather was a new claim. *Id.* 352 A.2d at 593. In the former case, the court observed, "the same cause is alleged for the increased incapacity as was alleged for the original injury," whereas in the latter, the claim is for additional disability arising "because of exposure to alleged deleterious conditions of employment occurring after entry of the 1967 award. . . ." *Id.* To apply the reopening provision "would have the effect of barring her claim before she even had one," which the court found "unreasonable and patently unjust." *Id.* 352 A.2d at 594. To avoid that result, the court applied, in a somewhat modified form, the limitations statute applicable to new claims. It adopted the view that "where an employee has once recovered compensation for an occupational disease and thereafter suffers additional disability from additional exposure to the conditions of employment after rendition of the original award, such an employee can file a claim petition for the disability so caused within [the two-year period of limitations] after the employee knew or ought to have known of the increased disability stemming from the continued employment. . . ." *Id.* *See also Bronico v. J.T. Baker Chemical Co.,* 209 N.J.Super. 220, 507 A.2d 279, 282 (App.Div.1986), allowing a second claim for increased noise-induced occupational hearing loss based on exposures following a previous award for such loss: "As petitioner's claim was based on continued noise exposure subsequent to his previous award in 1980, it was properly not considered a petition to review or modify the prior award. . . ." *Also Calabria v. Liberty Mut. Ins. Co.,* 4 N.J. 64, 71 A.2d 550 (1950).

New Jersey is not alone in this view. Connecticut, Illinois, Pennsylvania, West Virginia, and the U.S. Court of Appeals for the D.C. Circuit have also adopted a similar approach, although, in some instances, in a different context. In *Muldoon v. Homestead Insulation Co.,* 231 Conn. 469, 650 A.2d 1240 (1994), the employee, diagnosed with asbestosis, filed a claim based on his exposure to asbestos during his employment from 1947–1974. In 1977, he settled that claim and received $19,500. He remained in asbestos-related employment thereafter, until 1984, and, in 1987, filed a claim based on

a substantial increase in his pulmonary disability arising from the post–1974 exposures. The commissioner found as a fact that the increased disability was due substantially to the recent exposures, rather than a natural progression of the original disease. Allowing the claim as a new claim, the Connecticut Supreme Court concluded that "[t]o deprive a worker, such as Muldoon, of coverage for new injuries from subsequent exposures to asbestos would violate public policy and contravene the purpose of the act, which is to be liberally construed to provide coverage for employees who are injured on the job." *Id.* 650 A.2d at 1246. *Compare Duni v. United Technologies Corp./Pratt,* 239 Conn. 19, 682 A.2d 99 (1996), confirming but distinguishing *Muldoon.*

In *Ford v. State Workmen's Compensation Com'r.,* 160 W.Va. 629, 236 S.E.2d 234 (1977), two claimants each received a 15% permanent partial disability award for occupational pneumoconiosis, continued working, and, based on additional exposures occurring after the initial award, filed new claims. Under West Virginia law, occupational pneumoconiosis constituted an "injury." On that basis, the court held that subsequent exposures constituted new injuries and that the claimants were not limited to reopening the previous claims. The reopening provision, it concluded, provided "an additional rather than an exclusive method of adjusting prior claims." *Id.* 236 S.E.2d at 235. *See also White v. SWCC,* 164 W.Va. 284, 262 S.E.2d 752 (1980); *Anderson v. State Workers' Compensation Com'r,* 174 W.Va. 406, 327 S.E.2d 385 (1985); *Smith v. Workers' Compensation Com'r,* 179 W.Va. 782, 373 S.E.2d 495 (1988).

The Pennsylvania courts have also examined the nature of a claim for an occupational disability aggravated by repeated exposure. In *Mancini's Bakery v. W.C.A.B. (Leone),* 155 Pa.Cmwlth. 641, 625 A.2d 1308 (1993), the employee began experiencing pain in his knee in 1982 and in 1983 was diagnosed as having advanced degenerative osteoarthritic disease. He continued to work until 1990. In October, 1988, the disease was confirmed and he eventually underwent surgery. He filed his claim in November, 1988, asserting that the injury

was work-related and that it occurred in October, 1988. Positing that the claimant knew of his injury in 1983, the employer argued that the claim was not filed within three years after the injury and that notice was not given within 120 days of the injury, both as required by Pennsylvania law. The court rejected that argument and concluded instead that "[e]ach day that Claimant worked constituted a 'new' injury in that it aggravated his condition." *Id.* 625 A.2d at 1311. *See also USAir, Inc. v. W.C.A.B. (Schwarz)*, 160 Pa.Cmwlth. 100, 634 A.2d 714 (1993).

In *General Elec. Co. v. Industrial Commission*, 89 Ill.2d 432, 60 Ill.Dec. 629, 433 N.E.2d 671 (1982), the employee, while working for another employer, developed carpal tunnel syndrome. She underwent surgery and received a compensation award. Ten years later, while working for General Electric, she suffered a recurrence of the carpal tunnel syndrome. The evidence established that her new condition "was not simply a natural recurrence of her old problem, but the result of a new, work-related injury." *Id.*, 60 Ill.Dec. 629, 433 N.E.2d at 672. Illinois law at the time treated the claimant's weakened wrist condition, even when resulting from "a series of repetitive job-related stresses," as an accidental injury, and the court allowed the claim for the new injury.

Finally, in *Cadwallader v. Sholl*, 196 F.2d 14 (D.C.Cir.1952), a case arising under the Longshoremen's and Harbor Workers' Compensation Act, the employee, a baker, was disabled by dermatitis from July, 1944, to October, 1946. The dermatitis was caused by her contact with flour, and she received a compensation award. In 1947, she filed another claim, based on a recurrence of the dermatitis from and after December, 1946. The issue was whether the second claim was barred by a one-year statute of limitations, which depended on whether a new claim could be filed for the recurrence of the occupational disease. A majority of the court held that it could—that as a matter of law the recurrence constituted an "injury" within the meaning of the statute. Although Judge Prettyman, in dissent, disagreed that all recurrences constitute an injury and thus objected to the sweeping construction of the term "inju-

ry," he agreed that a recurrence arising from new contact with the cause of the disease would constitute a compensable injury. His only disagreement was including as a new injury a reappearance of the disease "even though the person has had no further contact with the original or any other recognized cause." *Id.* at 16.

There is nothing directly in the Maryland workers' compensation law that compels the result reached in *Waskiewicz.* The Court focused in that case on the definition of "disablement" in § 9–502(a), and, in particular, on the statement that disablement meant the "event" of a covered employee becoming partially or totally incapacitated. That statement led the Court to its notion of disablement, and with it the right to file a claim for compensation, as a singular event, a defining moment that can occur only once. It was concerned that allowing new claims for subsequent exposures after that "event" would render § 9–502(c), establishing the employer's liability, meaningless because "one could never pinpoint the compensable event of 'disability.' "

On further reflection, we think that focus was too narrow. The definition of "disablement" in § 9–502(a) must be read in conjunction with the definition of "occupational disease" in § 9–101(g). Prior to the enactment of the Labor and Employment Article, both definitions appeared in the same section of the Code—Article 101, § 67. "Occupational disease" was defined as "the *event* of an employee's becoming actually incapacitated, either temporarily, partially or totally, because of a disease contracted as the result of and in the course of employment . . . ." § 67(13) (emphasis added). "Disablement" was defined as "the *event* of an employee's becoming actually incapacitated, either partly or totally, because of an occupational disease, from performing his work in the last occupation in which exposed to the hazards of such disease . . . ." § 67(15) (emphasis added). Section 67(15) also defined "disability" as "the state of being so incapacitated." The definitions of "occupational disease" and "disablement" were parallel, and both hinged on an "event." When the Labor and Employment Article was enacted, as part of the code revision process, the

word "event" was deliberately deleted from the definition of "occupational disease." The Revisor's Note to § 9–101(g) points out that "[i]n the introductory language of this subsection, the former word 'event' is deleted as potentially misleading *since a disease normally is not characterized as an 'event.'*" (Emphasis added.) For whatever reason, a similar change was not made to the definition of "disablement," which, as noted, was removed from the general definition section and placed in § 9–502. The legislature did, however, delete the definition of "disability" as formerly contained in § 67(15).

These changes, at the very least, create some ambiguity as to the legislative intent. In redefining "occupational disease," the General Assembly seemingly acquiesced in the view that incapacity arising from an occupational disease is not triggered by an "event." The term "disablement," which retains the notion of an event, does not even appear in § 9–502(c)—the subsection that establishes the employer's liability for compensation in occupational disease cases. Subsection 9–502(c) requires compensation for "disability"—a term that previously was defined in conjunction with "disablement," but which was deleted. "Disablement" appears only in § 9–502(d), which, as noted earlier, focuses on the connection between the occupational disease and the employment, rather than on the employee's physical condition or incapacity. To highlight the word "event," appearing only in the definition of "disablement"—a definition of limited scope—and give it paramount significance is unwarranted. We find nothing to suggest that, by retaining the notion of an "event" in the definition of "disablement," after having deliberately deleted that notion from the definition of "occupational disease," the Legislature intended to preclude a covered employee, who suffers a disability from an occupational disease tied to his or her employment, from recovering compensation for a subsequent disability caused by a subsequent exposure.

Indeed, there is evidence of a contrary intent. Since 1968, employees disabled by a compensable occupational disease, along with employees disabled as the result of a compensable accidental injury, have been eligible for vocational rehabilita-

tion services designed to assist them in returning to gainful employment. Consistent with that approach, employees disabled by an occupational disease have been included, equally with employees disabled through accidental injury, in the Subsequent Injury Fund program. Section 9–802 expressly provides for compensation to employees with an existing permanent impairment who suffer a subsequent occupational disease that results in a greater permanent disability than would have resulted from the subsequent occupational disease alone, and apportions liability for that greater impairment between the employer and the Fund. The avowed purpose of these programs is to rehabilitate disabled workers and encourage employers to hire them. *See also* § 9–608, providing for apportioned benefits when an occupational disease aggravates a non-compensable disability. It strikes us as inconsistent with both the rehabilitation program and the entitlement to compensation for an increased disability arising from occupational disease contracted on the job to apply a "singular event" theory to foreclose compensation when the once-injured employee is, indeed, rehabilitated, and suffers a recurrence of the disability due to new work-related exposures.

The *Waskiewicz* approach may serve a narrow interest of some employers, but, as pointed out in a casenote review by M. Hourigan in 56 MD. LAW REV. 1019, 1043 (1997), the decision is at odds with public policy in a number of respects. It certainly does not comport with the legislative and judicial direction that the Workers' Compensation Act be construed liberally in favor of injured employees, to effect its benevolent purposes. § 9–102; *Howard Co. Ass'n, Retard. Cit. v. Walls,* 288 Md. 526, 530, 418 A.2d 1210, 1213 (1980); *R & T Construction v. Judge,* 323 Md. 514, 529, 594 A.2d 99, 107 (1991). It creates unnecessary distinctions between employees whose work-related disability is exacerbated by a subsequent accidental injury and those whose disability is exacerbated by subsequent work-related exposures. As Mr. Hourigan notes, "[p]otentially, the court's holding may deter employees exposed to occupational disease from filing initial claims for partial disability for fear that any attempt to recover for later

exposure and increased disability will be barred." 56 MD. L.REV. at 1041. This could be a particular problem if the employee anticipates returning to his or her same (or similar) job. Most significantly, as the *Waskiewicz* case itself dramatically illustrates, the law should not "create incentives for employers to abuse their employees" by exposing them to additional occupational hazards after the limitations period has expired. *Id.* at 142.

 Finally, we question whether the approach taken in *Mikitka* and the other cases discussed above would render § 9–502(c) or § 9–736 "meaningless," as suggested in *Waskiewicz*. A fair and clear distinction can be drawn, and hereby is drawn, between the worsening or aggravation of a disability due to a natural progression of the disease or to some other non-compensable cause and an aggravation or recurrence of the disability due to subsequent injurious exposures on the job. In the former case, the employee is left to his or her rights under § 9–736, to reopen the earlier claim, subject to the five-year period of limitations applicable to that section. In the latter case, the claim is a new one under § 9–502, based upon a new disability arising from the new injurious exposure, and the applicable period of limitations is that stated in § 9–711, commenced by the new disablement or the employee's actual knowledge that that disablement was caused by the employment. Except to the extent that an aggravation or recurrence may be due partly to a natural progression of the disease and partly to new exposures, in which event a partial remedy may lie under both § 9–502 and § 9–736, we hold that the two remedies are mutually exclusive and not cumulative. As indicated, an application under § 9–736 is reserved for an aggravation attributable to the disability already adjudicated, for which compensation was paid. A new claim under § 9–502, if based on the same occupational disease, is limited to an aggravation or recurrence resulting from new exposures. Although, when the evidence could lead to different conclusions in this regard, an employee might properly seek relief alternatively under both sections, subject to the applicable statutes of limitations, any relief must be founded upon one or the other,

depending on the findings made by the Commission or a reviewing court. Relief may not be had under one section merely because it is not affordable under the other, however. The evidence must demonstrate that the aggravation or recurrence arises from a new disablement to fall within § 9–502; to the extent that it does, relief is not affordable under § 9–736, and *vice versa*. As *Waskiewicz* is inconsistent with these conclusions, it is overruled.

## C. *Conclusion*

As we observed, the Commissioner, based on his layman's knowledge of cardiovascular disease and without the benefit of any factual or expert evidence, concluded that Schwing's coronary artery disease in 1994 was a worsening of the cardiovascular disease that led to the 1982 myocardial infarction and, therefore, could not constitute a new claim. That ultimate conclusion may be correct, but it must be based on evidence, not a layman's supposition. The evidence before the Commission—principally Dr. Rudikoff's medical records—could lead to a different conclusion. Mr. Schwing apparently made a complete recovery from the 1982 incident; he returned to work and normal activity and remained symptom-free for 10 years. As a firefighter, of course, he enjoys a presumption under § 9–503 that the heart disease disability discovered in 1993 was a compensable occupational disease. It appears, moreover, that the part of the heart affected by the 1982 infarction was not the same as that shown to be diseased in 1993. Although both conditions presumably flow from cardiovascular disease, that disease, which affects more than 58 million Americans, is not a singular malady, but rather encompasses four principal diseases—ischemic (coronary) heart disease, affecting nearly 14 million people; some forms of hypertensive disease, affecting about 50 million people; rheumatic fever/rheumatic heart disease, affecting nearly two million people; and cerebrovascular disease (stroke), affecting about four million people—as well as a significant number and variety of other ailments, including arrhythmias, artery diseases, bacterial endocarditis, cardiomyopathy, congenital heart

defects, congestive heart failure, and valvular heart disease. *See* AMERICAN HEART ASSOCIATION, 1998 HEART AND STROKE STATISTICAL UPDATE; *also* INTERNATIONAL CLASSIFICATION OF DISEASES, 9TH REVISION (1997), prepared by the National Centers for Disease Control and Prevention.

The classification data at least suggests that all myocardial infarctions are not the same, that, although they all may result from cardiovascular disease, there are many different forms that cardiovascular disease, or even heart disease, can take, and that a second disabling event may not necessarily be related to, or arise from the same disease as, the first. There is a legitimate question, on the basis of this record, of whether the infarction suffered by Mr. Schwing in 1982 constituted a compensable disablement. The causal relationship required by § 9–502, even with the presumption afforded by § 9–503, was in dispute in this case, both in 1983 and in 1994, and the resolution of it must rest on more than a Commissioner's lay understanding of complex medical questions.

We hold, therefore, that the Commission erred in summarily dismissing Claim B on limitations grounds. With respect to that claim, the Commission will have to determine, from evidence, whether Mr. Schwing's condition in 1993–94(1) constituted a new disablement arising from his employment within the period of limitations set forth in § 9–711, or, conversely (2) constituted either a non-compensable disability not within the ambit of §§ 9–502 and 9–503, or the natural worsening of a disablement suffered in 1982. If the former, Schwing's claim will have to be adjudicated on the merits; if the latter, the claim will have to be resolved under § 9–736, subject to the statute of limitations therein. We express no views with respect to the viability of Claim A.

JUDGMENT OF COURT OF SPECIAL APPEALS AFFIRMED, WITH COSTS.

Concurring opinion by RAKER, J., in which RODOWSKY, J., joins.

RAKER, Judge, concurring.

I concur in the judgment of the Court. I would affirm the judgment of the Court of Special Appeals and remand for further proceedings consistent with the reasons stated in Section C of the majority opinion. Maj. op. at 206–207. I would not overrule *Waskiewicz*, however, and for that reason, I write separately.

The majority recognizes that "[t]here are, indeed, some distinctions that can be drawn between this case and *Waskiewicz*," maj. op. at 197, but rather than distinguish *Waskiewicz*, the majority chooses to overrule it. Based primarily on the doctrine of *stare decisis*, I disagree.

I would hold that the Commission erred in summarily dismissing Claim B on limitations grounds, not, as the Court of Special Appeals concluded, because a permanent partial disability is, in a generic sense, separately compensable from an earlier temporary total disability, but because the Commission's conclusion in this case was not based on sufficient evidence. I would have the Commission determine, from evidence, whether Mr. Schwing suffered a disablement from an occupational disease in 1993–94. In making that determination, it should decide whether he suffered a disablement at all and if so, whether that disablement in fact occurred in 1982–83 from the same occupational disease upon which Claim B is based. From that, it should then have to determine whether his 1993–94 condition amounted merely to an aggravation or worsening of an earlier disablement or constituted an initial disablement.

The majority suggests, in Section C, that Mr. Schwing's coronary artery disease in 1994 may constitute a new disablement arising from his employment within the period of limitations set forth in § 9–711 not because he suffered an additional injurious exposure to hazards aggravating an existing disability but because there are "many different forms that cardiovascular disease, or even heart disease, can take, and that a second disabling event may not necessarily be related to, or arise from the same disease as, the first." Maj. op. at

207. The majority points out that "the Commissioner, based on his layman's knowledge of cardiovascular disease and without the benefit of any factual or expert evidence, concluded that Schwing's coronary artery disease in 1994 was a worsening of the cardiovascular disease that led to the 1982 myocardial infarction, and, therefore, could not constitute a new claim." Maj. op. at 206. The question of whether the 1982 infarction constituted a compensable disablement "is a legitimate question" and the causal relationship required by § 9–502 must rest on more than a Commissioner's lay understanding of complex medical questions. On this basis, this Court should affirm *Schwing* and avoid revisiting *Waskiewicz.*

This Court should adhere to the doctrine of *stare decisis* and should not overrule *Waskiewicz. Stare decisis* promotes a predictable and consistent development of legal principles. The Supreme Court said of *stare decisis:*

> [I]t is indisputable that *stare decisis* is a basic self-governing principle within the Judicial Branch, which is entrusted with the sensitive and difficult task of fashioning and preserving a jurisprudential system that is not based upon "an arbitrary discretion." The Federalist, No. 78, p. 490 (H. Lodge ed. 1888)(A.Hamilton). See also *Vasquez v. Hillery,* 474 U.S. 254, 265 [106 S.Ct. 617, 88 L.Ed.2d 598] (1986)(*stare decisis* ensures that "the law will not merely change erratically" and "permits society to presume that bedrock principles are founded in the law rather than in the proclivities of individuals").

*Patterson v. McLean Credit Union,* 491 U.S. 164, 172, 109 S.Ct. 2363, 2370, 105 L.Ed.2d 132 (1989). Although *stare decisis* is not an inexorable command, the doctrine "is of fundamental importance to the rule of law. For this reason, 'any departure from the doctrine ... demands special justification.'" *Welch v. Texas Highways & Public Transp. Dept.,* 483 U.S. 468, 494–95, 107 S.Ct. 2941, 2957, 97 L.Ed.2d 389 (1987)(quoting *Arizona v. Rumsey,* 467 U.S. 203, 212, 104 S.Ct. 2305, 2311, 81 L.Ed.2d 164 (1984)). The Supreme Court has noted that in the area of statutory construction, the party urging the abandonment of established precedent has a great-

er burden than in the context of constitutional construction, because "the legislative power is implicated, and Congress remains free to alter what we have done." *Patterson,* 491 U.S. at 172–73, 109 S.Ct. at 2370, 105 L.Ed.2d at 148.

This Court has repeatedly stressed the importance of *stare decisis,* for "consistency and stability in this Court's ruling . . . are necessary for our citizens to know their respective rights and obligations." *Herring v. Christensen,* 252 Md. 240, 242, 249 A.2d 718, 719 (1969). This is particularly true in the area of workers' compensation, as "one of the key virtues of a *statutory* workers' compensation system is its predictability." *Waskiewicz v. General Motors Corp.,* 342 Md. 699, 714, 679 A.2d 1094, 1101 (1996). The majority has offered insufficient reasons to warrant this Court to undertake the extraordinary step of overruling *Waskiewicz.*

The Court decided *Waskiewicz* just two years ago. Neither law nor facts supporting *Waskiewicz* have changed since we decided that case. Indeed, the only justification asserted by the majority to overrule a case of such recent vintage is that the result is unfair, and the decision is wrongly decided. The majority has not demonstrated that "the rule [laid out in *Waskiewicz* ] has become unsound in the circumstances of modern life." *White v. King,* 244 Md. 348, 354, 223 A.2d 763, 767 (1966). The majority does not suggest that there are any changes or developments in the few years since *Waskiewicz* was decided to justify overruling the case. The only difference today is the composition of the Court, with the additions of Judge Wilner and Judge Cathell following the retirements of Chief Judge Murphy and Judge Karwacki. Even the majority would concede that this is an unsound basis to overrule a case. Unlike the legislature, this Court cannot in good conscience overrule cases on the basis of different personnel.

The court decided *Waskiewicz* on July 29, 1996. *Waskiewicz v. General Motors Corp.,* 342 Md. 699, 679 A.2d 1094 (1996). As the majority notes, this Court held in a 4–3 decision that "under § 9–502, an employee who has already claimed benefits for a disability caused by an occupational

disease cannot base a new claim for benefits upon additional injurious exposures which cause a worsening of his or her condition but not a new disability." *Id.* at 700, 679 A.2d at 1095. The arguments on both sides of this issue were explicated fully in the opinion for the Court, written by Judge Karwacki, and in the dissenting opinion, written by Judge Chasanow.

In the majority opinion, we noted that "[t]he essence of Mr. Waskiewicz's argument is that his additional and injurious exposure to the hazards of carpal tunnel syndrome, caused by his *return* to the assembly line *after* having been removed from the assembly line, was more analogous to a new accidental personal injury than an aggravation of an existing disability." *Id.* at 711, 679 A.2d at 1100. We questioned the underlying assumptions in his analogy and found it "quite clear that if Mr. Waskiewicz had suffered the disability in the 1970s and stayed on the assembly line without interruption, and his carpel tunnel syndrome continued to worsen over that time, his only opportunity for increased benefits would be under the reopening provision." *Id.* We concluded that Mr. Waskiewicz's argument was "founded on the notion that the employer's actions in removing him from and then reassigning him to the repetitive motion work were the significant events triggering a new claim." *Id.* We reviewed the plain language of the statute and the legislative history, and rejected this argument, concluding that "[t]he General Assembly has determined that both a disablement resulting from an occupational disease and an accidental personal injury on the job constitute compensable events under the statutory scheme; it has not determined, at least as of the date of this opinion, that an employer's knowing reassignment of an already disabled worker to hazardous duty, without more, is a compensable event." *Id.* at 714, 679 A.2d at 1102.

Although we noted the unfairness to Mr. Waskiewicz, we refused to write new legislation. We determined that "[t]his Court cannot and will not usurp the General Assembly's authority to expand the scope of the Act in this manner." *Id.* at 715, 679 A.2d at 1102. We should not do so today.

Today, the majority overrules *Waskiewicz*, reasoning that "the position taken in *Waskiewicz* is not only unsupported by any out-of-State case law that we could find but is, in fact, contrary to the position taken in a number of other States." Maj. op. at 197. The majority also argues that considerations of policy and fairness favor a position contrary to *Waskiewicz*.

The majority states that the position taken in *Waskiewicz* is contrary to the position taken in other states. Cases from other jurisdictions generally are unpersuasive because "Maryland's Workers' Compensation statute differs from that in most states." *Beverage Capital v. Martin,* 119 Md.App. 662, 671 n. 6, 705 A.2d 1175, 1180 n. 6 (1998); *See Federated Stores v. Le,* 324 Md. 71, 82–83, 595 A.2d 1067, 1072–73 (1991) (distinguishing the workers' compensation case at issue from out-of-state cases on the basis that the statutory language contained in the Maryland Workers' Compensation Act differed from that of the other states); *Anderson v. Bimblich,* 67 Md.App. 612, 613 n. 1, 508 A.2d 1014, 1014 n. 1 (1986)(deeming cases from other jurisdictions unpersuasive because of the difference in the applicable workers' compensation laws).

While at first glance the majority appears to make a strong showing that many states have adopted positions contrary to *Waskiewicz,* the cases relied upon by the majority are all distinguishable, particularly because workers' compensation statutes vary from state to state. Upon closer examination, it becomes apparent that most of the out-of-state cases did not address the principal issue raised in *Waskiewicz, i.e.* whether an employee who has claimed benefits for a disability caused by an occupational disease can base a new claim for benefits upon additional injurious exposures which cause a worsening of his or her condition but not a new disability. *Waskiewicz v. General Motors Corp.,* 342 Md. 699, 700, 679 A.2d 1094, 1095 (1996).

The cases relied upon by the majority are factually and legally distinct from the situation which faced the court in *Waskiewicz.* Perhaps that is why, although all of these cases

had been decided at the time of *Waskiewicz,* none were cited in either the *Waskiewicz* majority or dissent. The dissent in *Waskiewicz* acknowledged that it found only one appellate decision, *Mikitka v. Johns–Manville Products Corp.,* 139 N.J.Super. 66, 352 A.2d 591 (App.Div.1976), "clearly on point." *Waskiewicz,* 342 Md. at 722, 679 A.2d at 1106 (Chasanow, J., dissenting). Thus, with the exception of *Mikitka* (an opinion quoted extensively by the *Waskiewicz* dissent and apparently unpersuasive to the *Waskiewicz* majority), the cases mentioned by the majority today lend little support to the decision to overrule *Waskiewicz.*

For example, in *Muldoon v. Homestead Insulation Co.,* 231 Conn. 469, 650 A.2d 1240 (1994), an employee suffering from pulmonary asbestosis filed for workers' compensation for pulmonary asbestosis caused by exposure to asbestos from 1947 to 1974. In 1977, the employee entered into a settlement agreement with numerous defendants as to that claim.[1] *Id.* 650 A.2d at 1241. The employee continued working in asbestos related employment until 1984. *Id.* In 1987, the employee filed a claim for workers' compensation for an increase in his pulmonary disability caused by exposure to asbestos after the time covered by the settlement agreement. *Id.* 650 A.2d at 1241–42.

---

1. "The parties agreed that payments were 'in full accord and satisfaction of a disputed claim' and 'shall be made and accepted as a full and final settlement for all compensation for said injury and for all results upon [Muldoon], past, present and future, and for all claims for past, present, and future medical, surgical, hospital and incidental expenses and all compensation which may be due to anyone in case of the death of [Muldoon], to the end that the payment of such sum shall constitute a complete satisfaction of all claims due or to become due at any time in favor of anybody on account of the claimed injury, or on account of any condition in any way resulting out of the said injury, or on account of the death of [Muldoon] on account of said condition.'" Muldoon further agreed that he understood the settlement agreement to be a "full and final settlement and that it is intended to deal with any and all conditions, known or unknown, which exist as of the date thereof, or any changes of conditions which may arise in the future on account of said alleged occupational disease occurring between 1947 and 1974." *Muldoon v. Homestead Insulation Co.,* 231 Conn. 469, 650 A.2d 1240, 1241 (1994).

Unlike Mr. Waskiewicz, Mr. Muldoon did not pursue his first claim for workers' compensation, did not receive a determination that he was suffering from a disability as to his first claim, and did not recover benefits under this first claim. Instead, he settled his claim with various defendants. While the court characterized the damage caused by the second exposure as a 'new injury,' it did so only in the context of deciding whether the workers' compensation claim was barred by the specific language of the settlement agreement. *Id.* 650 A.2d at 1244. Finally, the *Muldoon* court did not have occasion to engage in statutory construction, nor did the court construe language similar to Maryland's statutory provisions governing occupational disease.

The court in *Mancini's Bakery v. W.C.A.B. (Leone)*, 155 Pa.Cmwlth. 641, 625 A.2d 1308 (1993), addressed whether the statute of limitations barred a worker's initial claim for degenerative osteoarthritic disease. Although the worker was diagnosed with the disease in 1983, he did not attempt to file a claim until November of 1988. *Id.* 625 A.2d at 1310. Pennsylvania law required that an employee file a claim within three years of an injury. *Id.* 625 A.2d at 1311. The court concluded that the employee's petition was timely. *Id.*

Mancini was not an occupational disease case. Under the Pennsylvania Workmens' Compensation Act, it involved "personal injury." The *Mancini* court emphasized that the timing rules applicable in personal injury cases differed from those applicable in occupational disease cases. The court concluded:

> The medical evidence presented by both parties clearly established, and the referee found, that Claimant was suffering from a preexisting condition aggravated by the requirements of his job. Each day that Claimant worked constituted a "new" injury in that it further aggravated his condition.[2]

---

**2.** This result is an illustration of an "untenable outcome" which the Court predicted in *Waskiewicz:*

> Mr. Waskiewicz's theory of exposure to the hazards of an occupational disease as a compensable event in itself, if put into practice, would

*Id.* 625 A.2d at 1311. Whereas *Waskiewicz* asked whether an employee who had previously received benefits could assert a new claim for worsening of an occupational disease based on new exposure, *Mancini* asked only whether the aggravation of a pre-existing injury constituted a "new injury" for the purpose of filing an initial claim within the statute of limitations.

The majority maintains that *Waskiewicz* "is at odds with public policy." Maj. op. at 204. The thrust of the majority's argument is that *Waskiewicz's* interpretation is unfair to employees. We noted this element of unfairness in Waskiewicz. We also noted that a claim of unfairness is directed more properly to the General Assembly. This Court has repeatedly recognized that "the legislature is the appropriate forum to balance the equity or fairness of a particular statutory provision in a workers compensation scheme." *Philip Electronics v. Wright,* 348 Md. 209, 229, 703 A.2d 150, 159 (1997).

Two legislative sessions have passed since we filed *Waskiewicz.* Presumably, if the General Assembly disagreed with our interpretation of the statute, it would have said so. *See Williams v. State,* 292 Md. 201, 210, 438 A.2d 1301, 1305 (1981). In the 1997 legislative session, the Legislature made many changes to other sections of Title 9, the Workers' Compensation Act, but left the provisions interpreted by *Waskiewicz* unchanged. *See, e.g.,* 1997 Maryland Laws ch. 70 at 1400 (codified at Maryland Code (1991, 1997 Supp.) Labor and Employment Article § 9–309(e), § 9–316(a), § 9–401(b), § 9–402(a), § 9–1006(d)); 1997 Maryland Laws ch. 350 at 2455 (codified as amended at Maryland Code (1991, 1997 Supp.) Labor and Employment Article § 9–602, § 9–630, § 9–637); 1997 Maryland Laws ch. 591 at 3258 (codified as amended at Maryland Code (1991, 1997 Supp.) Labor and Employment Article § 9–104); 1997 Maryland Laws ch. 641 at 3633 (codi-

---

lead to untenable outcomes. For example, if his theory prevailed, one might successfully argue that each day of work following the first claim of disability contributed, however slightly, to a worsening of the disability, thereby entitling the claimant to a new claim each day. *Waskiewicz v. General Motors Corp.,* 342 Md. 699, 708, 679 A.2d 1094, 1099 (1996).

fied at Maryland Code (1991, 1997 Supp.) Labor and Employment Article § 9–742). The fact that it has taken no action to alter our interpretation evidences the Legislature's acquiescence in our construction of the statute expressed in *Waskiewicz*. Along these same lines, Judge Eldridge, writing for the Court in *Williams v. State*, 292 Md. at 210, 438 A.2d at 1305, observed:

> The General Assembly is presumed to be aware of this Court's interpretation of its enactments and, if such interpretation is not legislatively overturned, to have acquiesced in that interpretation. This presumption is particularly strong whenever, after statutory language has been interpreted by this Court, the Legislature re-enacts the statute without changing in substance the language at issue. Under these circumstances, it is particularly inappropriate to depart from the principle of stare decisis and overrule our prior interpretation of the statute.

*See also Baltimore City Police v. Andrew*, 318 Md. 3, 18–19, 566 A.2d 755, 762 (1989); *Frank v. Storer*, 308 Md. 194, 203–04, 517 A.2d 1098, 1102–03 (1986).

Judge RODOWSKY has authorized me to state that he joins in the views expressed herein.