672 A.2d 155

**Mary P. HELINSKI**

v.

**C & P TELEPHONE COMPANY.**

**No. 782, Sept. Term, 1995.**

Court of Special Appeals of Maryland.

March 1, 1996.

462

R. Stewart Barroll (Hoon & Barroll, on the brief), Chestertown, for Appellant.

William S. Tostanoski (Andrea J. Weisstuch on the brief), Baltimore, for Appellee.

Argued before WILNER, C.J., MOYLAN, J., and PAUL E. ALPERT, Judge (retired) Specially Assigned.

ALPERT, Judge.

Statutory construction and the attendant linguistical gymnastics that pertain to the timeliness of a claim of occupational disease under Maryland's Workers' Compensation Act ("Act") are the tasks presented to us by Mary P. Helinski, appellant, ("Ms. Helinski") and Chesapeake and Potomac Telephone Company, appellee, ("C & P") who were, respectively, employee and employer. Ms. Helinski, whose claim for workers' compensation was denied by the Workers' Compensation Commission ("Commission"), sought relief from the Circuit

Court for Anne Arundel County. No recourse was found there, however, as the circuit court dismissed her claim on C & P's motion for summary judgment. Continuing her quest for redress, Ms. Helinski now comes before us and presents two issues for our consideration.

I.  Whether the lower court erred in denying Appellant's Motion to Strike the Appellee's Motion for Summary Judgment where the latter was not filed with a supporting affidavit, and where the affidavit filed during the hearing on the motion was not upon personal knowledge as required by Md.Rule 2–501(c)[.]

II.  Whether the facts and circumstances surrounding the onset of Mrs. Helinski's disease and the date that Mrs. Helinski actually knew that the disablement was caused by her employment, demonstrate a material doubt about whether she filed her claim in time which requires resolution by a trial rather than by summary judgment[.]

At oral argument, the parties asked that we address the substantive matter, issue II, to the exclusion of issue I. Accordingly, we turn our attention to issue II.

C & P [1] employed Ms. Helinski as a service representative beginning in 1972. For our purposes, nothing significant occurred in the employment relationship until February 15, 1989. On that day, Ms. Helinski met with Dr. Paul Berson, an ophthalmologist, who, in response to Ms. Helinski's statements and his examination, diagnosed her with "contact allergic dermatitis" of the eyelid. Dr. Berson was unable to pinpoint the cause of Ms. Helinski's dermatitis.

Ms. Helinski informed her superiors of her dermatitis, and was directed to fill out health insurance and office forms. Ms. Helinski took Dr. Berson's bill and a prescription receipt to C & P's medical department on March 28, 1989. Dr. Brown, a physician employed by C & P, examined Ms. Helinski and suggested to her that, although he was not sure what was causing the dermatitis, formaldehyde might be a culprit. In

---

1.  C & P has since become Bell Atlantic.

response to Dr. Brown's question as to whether there were new materials in Ms. Helinski's workplace, she replied that her Annapolis office contained new furniture and carpeting. Dr. Brown, according to Ms. Helinski, stated that C & P would further investigate the cause of her dermatitis.

C & P returned to Ms. Helinski, sometime in May 1989, Dr. Berson's bill and the prescription receipt. Ms. Helinski's supervisor notified her that C & P would not reimburse her because C & P did not find her dermatitis to be work related.

In April of 1989, Ms. Helinski's supervisor advised her that according to the office furniture supplier formaldehyde was not used in the furniture's manufacturing process. Ms. Helinski's supervisor did note, however, that the carbonless paper manufacturers stated that although the papers did not contain harmful materials, they may have a "pungent odor" when first used.

Ms. Helinski submitted to C & P's multiphasic health screen on July 20, 1989. On that day she did not exhibit symptoms of her earlier eye irritation. The dermatitis, which had subsided by late May of 1989, had not caused Ms. Helinski to miss any time from work, nor had it prevented her from performing job related tasks.

Ms. Helinski departed for maternity leave in October 1989 and returned in September 1990. Upon her return to active employment, she attended a six-week training session held at C & P's Calverton office. When she returned to C & P's Annapolis office, in late October, her symptoms reappeared. In December of 1990, Dr. Fratto, a C & P physician, evaluated Ms. Helinski's complaints, and directed that her work station be changed. He suggested that her dermatitis might be related to her use of personal care products. Her condition improved in December of 1990 and January of 1991, during which time she was stationed in C & P's Baltimore office.

The dermatitis and other maladies finally took their toll upon Ms. Helinski on April 25, 1991, when she missed her first time from work due to the symptoms. Until that day, she had not missed any work time because of the dermatitis.

On January 30, 1992, Dr. Grace Ziem diagnosed Ms. Helinski as having an occupational disease. Later that year, on July 1, 1992, Ms. Helinski filed a workers' compensation claim, citing an occupational disease.

The Commission conducted a hearing on August 3, 1993, at which Ms. Helinski testified. The next day, the Commission rendered its decision.

Hearing was held in the above claim at Baltimore, Maryland on August 3, 1993, on the following issue[s]:

1. Did the employee sustain an occupational disease arising out of and in the course of employment?

2. Limitations.

The Commission finds, based on the evidence presented, that the claimant did not sustain an occupational disease of multiple chemical sensitivity arising out of and in the course of employment as alleged to have occurred on February 28, 1992.[2] In addition to the evidence presented, the claim would have been time barred by limitations even if the claimant had sustained an occupational disease. Therefore, the Commission will disallow the claim filed herein....

The Circuit Court entered summary judgment against Ms. Helinski because C & P's "exhibits show[ed] that [Ms. Helinski] ha[d] reason to believe she had an occupational disease as of the date she filed her On–Duty Injury Report.... [Ms.

---

**2.** Before the Commission, Ms. Helinski testified, in part, that on April 25, 1991, after lunch, she returned to her Annapolis office

[a]nd started having problems with not being able to see parts of the wall, so I called an opthamologist and I saw the doctor and he said I need to see him in emergency because I could have a brain tumor. I had swollen optic nerves, enlarged blind spots in the visual field and irregular optic discs, and I saw the neurologist who did a CAT scan and said that was negative and then did a lumbar puncture and that was negative and I was out of work for six weeks and the symptoms went away.

In her workers' compensation employee's claim, Ms. Helinski alleged that she was unable to work on February 28, 1992 because of nervous, respiratory, and cardiovascular symptoms caused by "renovation/remodeling/restriction of fresh air flow and inhalation resulting in multiple chemical sensitivity[.]"

Helinski's] July 1, 1992 claim has, therefore, been filed too late. . . ."

### *Timeliness of Filing of the Claim*

■ Maryland Rule 2–501(e) governs the entry of judgment on a motion for summary judgment. In relevant part, the Rule states:

> The court shall enter judgment in favor of or against the moving party if the motion and response show that there is no genuine dispute as to any material fact and that the party in whose favor judgment is entered is entitled to judgment as a matter of law.

Md.Rule 2–501(e) (1996). We review on appeal whether the lower court was legally correct. *Pope v. Board of School Comm'rs*, 106 Md.App. 578, 590, 665 A.2d 713 (1995).

Chief Judge Robert C. Murphy recited the tenets of statutory construction in *Condon v. State*, 332 Md. 481, 632 A.2d 753 (1993). As he stated for the Court of Appeals:

> The cardinal rule of statutory construction is to ascertain and carry out the true intention of the legislature. In searching for legislative intention, a court looks for the general purpose, aim, or policy behind the statute. We first look to the plain meaning of the language of the statute to discern legislative intent. Where the language is clear and unambiguous, a court may not add or delete words to make a statute reflect an intent not evidenced in that language to avoid a harsh result. A clearly worded statute must be construed without 'forced or subtle interpretations' that limit or extend its application. The language must be examined in the context in which it was adopted. All parts of a statute are to be read together to determine intent, and reconciled and harmonized to the extent possible. If reasonably possible, a statute should be read so that no part of it is rendered nugatory or superfluous. Where a statute may be susceptible of more than one meaning, the court may consider the consequences of each meaning and adopt that construction which avoids a result that is unreasonable,

illogical or inconsistent with common sense. It often is necessary to look at the development of a statute to discern legislative intent that may not be as clear upon initial examination of the current language of the statute.

*Id.* at 490–91, 632 A.2d 753 (citations omitted). With these guidelines in mind, we turn to the statutory sections at issue and the interpretation thereof.

The Act is now codified in Title 9 of the Labor and Employment Article. Desirous of not leaving us without guidance as to its intent, the Legislature included a section pertaining to the Act's construction.

(a) *In general.*—This title shall be construed to carry out its general purpose.

(b) *Rule for strict construction inapplicable.*—The rule that a statute in derogation of the common law is to be strictly construed does not apply to this title.

§ 9–102 of the Labor and Employment Article (Repl.Vol.1991) ("L.E."). Maryland courts have followed these dictates. *See R & T Constr. Co. v. Judge,* 323 Md. 514, 529, 594 A.2d 99 (1991) (applying former Article 101, § 63, of the Maryland Annotated Code, which was the precursor of § 9–102).

The gist of C & P's argument is that the statute of limitations has run its course on Ms. Helinski's suit because she knew that she had an occupational disease as early as March of 1989, or at the latest, in December of 1989. C & P further contends that "[t]here is no dispute that [Ms. Helinski] was disabled throughout 1989 and thereafter. By [her] own testimony and the documents submitted with the Motion for Summary Judgment, [Ms. Helinski] has set forth specific intolerance to performing within her work environment."

The Act generally grants to an employee or her dependents two years within which to file a claim for disablement or death.

(a) *Filing claim.*—If a covered employee suffers a disablement or death as a result of an occupational disease, the covered employee or the dependents of the covered employee shall file a claim with the Commission within 2 years, or

in the case of pulmonary dust disease within 3 years, after the date:

(1) of disablement or death; or

(2) when the covered employee or the dependents of the covered employee first had *actual knowledge that the disablement was caused by the employment.*

(b) *Failure to file claim.*—Unless waived under subsection (c) of this section, failure to file a claim in accordance with subsection (a) of this section bars a claim under this title.

(c) *Waiver.*—The defense of failure to file a claim in accordance with subsection (a) of this section is waived if the employer or its insurer:

(1) fails to raise the defense of the failure to file the claim at a hearing on the claim before the Commission makes any award or decision;

(2) pays compensation for the disability or death arising from the occupational disease; or

(3) by its affirmative conduct leads the covered employee or other claimant to reasonably believe that the requirement of filing a claim has been waived.

§ 9–711 L.E. (emphasis added). We glean from this section that Ms. Helinski could not have filed a claim unless she contracted an "occupational disease" that caused her "disablement." Occupational disease and disablement, the terms key to this discussion, are defined in other sections of the Act.

According to § 9–101(g), the Act's definitions section,

(g) "Occupational disease" means a disease contracted by a covered employee:

(1) as a result of and in the course of employment, and

(2) that causes the covered employee [3] to become temporarily or permanently, partially or totally incapacitated.

---

**3.** No dispute exists as to whether Ms. Helinski was a covered employee. *See* § 9–101(f) L.E. (definition of "covered employee").

§ 9–101(g) L.E. Ms. Helinski's pleadings allege that her dermatitis and other symptoms arose, after their first manifestation, whenever she was situated in C & P's Annapolis office. In addition, Dr. Ziem diagnosed her as having a work related disease. Thus, we next examine the term "incapacitated."

As § 9–101(g) declares, incapacity may take on four main forms: (1) temporary partial incapacitation; (2) temporary total incapacitation; (3) permanent partial incapacitation; and (4) permanent total incapacitation. These categories, however, cannot be rigidly maintained. For example, a covered employee may regress from number (2) to number (4) or progress from (2) to full health.

■ Furthermore, the incapacitation must relate to the covered employee's ability to perform whatever work that employee was engaged in last.

(a) *"Disablement" defined.*—In this section [subtitle 5, entitlement to and liability for compensation], "disablement" means the event of a covered employee becoming partially or totally incapacitated:

(1) because of an occupational disease; and

(2) from performing the work of the covered employee in the last occupation in which the covered employee was injuriously exposed to the hazards of the occupational disease.

(b) *Scope of application to employer and insurer.*—Subsection (c) of this section applies only to:

(1) the employer in whose employment the covered employee was last injuriously exposed to the hazards of the occupational disease; and

(2) the insurer liable for the risk when the covered employee, while employed by the employer, was last injuriously exposed to the hazards of the occupational disease.

(c) *Liability of employer and insurer.*—Subject to subsection (d) of this section and except as otherwise provided,

an employer and insurer to whom this subsection applies shall provide compensation in accordance with this title to:

(1) a covered employee of the employer for disability of the covered employee resulting from an occupational disease; or

(2) the dependents of the covered employee for death of the covered employee resulting from an occupational disease.

(d) *Limitation on liability.*—An employer and insurer are liable to provide compensation under subsection (c) of this section only if:

(1) the occupational disease that caused the death or disability:

(i) is due to the nature of an employment in which hazards of the occupational disease exist and the covered employee was employed before the date of disablement; or

(ii) has manifestations that are consistent with those known to result from exposure to a biological, chemical, or physical agent that is attributable to the type of employment in which the covered employee was employed before the date of disablement; and

(2) on the weight of the evidence, it reasonably may be concluded that the occupational disease was incurred as a result of the employment of the covered employee.

§ 9–502(a)–(d) L.E. Disablement is equivalent to incapacitation. *Belschner v. Anchor Post Prods. Inc.*, 227 Md. 89, 93, 175 A.2d 419 (1961) (Although "the words 'actually incapacitated' are not defined in the [Act [4]], obviously because they are neither ambiguous nor equivocal and import no technical industrial meaning, it has been said that an employee is not incapacitated within the intent of the law 'if, though injured, [he] still has the capacity, the ability to, and does continue to

---

4. Article 101, § 67(13) defined "occupational disease" as "the event of an employee's becoming actually incapacitated, either temporarily, partially or totally, because of a disease contracted as the result of and in the course of employment." Md.Code (1957), Art. 101, § 67(13), *quoted in, Belschner*, 227 Md. at 93, 175 A.2d 419.

perform his regular work, for which he was employed and receives his usual pay for the work.'") (*quoting from Lumbermen's Reciprocal Ass'n v. Coody,* 278 S.W. 856, 857 (Tex.Civ. App.1926)); *see Adams v. Western Elec. Co.,* 63 Md.App. 587, 591, 493 A.2d 392, *cert. denied,* 304 Md. 301, 498 A.2d 1186 (1985).

■■■■ The disablement complained of must relate to the requirements of the job last performed.

"An incapacity to work in one set of conditions applicable to a particular job does not necessarily indicate or equate with an incapacity to perform the work in an occupation. Whether a disablement suffices to be occupational in scope would depend, at least in part, upon how the occupation is defined and how much of the range of activity fairly included within the occupation is in fact foreclosed to the claimant. If, indeed, the claimant is able to continue to perform reasonably analogous work within the same occupational classification at the same or higher wages, he is not incapacitated 'from performing his work in the last occupation.'"

*Adams,* 63 Md.App. at 593, 493 A.2d 392. *See CES Card Establishment Servs., Inc. v. Doub,* 104 Md.App. 301, 656 A.2d 332 (1995) (summarizing discussion of definition of incapacitation).

■■■ C & P contends that Ms. Helinski's claim should be time barred because, it alleges, she knew, as early as March of 1989, or at the latest, as of December 1989, that she was disabled. Awareness is but one factor that a court considers when evaluating a statute of limitations defense. The following discussion from Larson's Workmen's Compensation Law is instructive on this point.

Manifestation [of an occupational disease] is sometimes identified as a suitable starting point [towards ameliorating the harshness of a non-discovery statute of limitations]. Although it clearly should be a minimum requirement, standing alone it is inadequate. The reason is that a claimant could not reasonably be expected to file a claim for

every symptom such as shortness of breath until the connection with the employment is apparent.

The modern view, then, requires knowledge. The period does not begin to run until the claimant knew or should have known the nature and seriousness of his condition and its relation to the employment.

But, while this takes care of the great bulk of the cases, there is still the possibility that there may be such knowledge without actual disability. It would not be desirable to force workers to apply for compensation in these circumstances, while still fully employed, on pain of losing their rights altogether. The optimum rule then, which has been always favored by this Treatise, and which appears also in the Council of State Government's Model Act, is a dual one:

> The period begins to run when the disease has culminated in disability and when by reasonable diligence the claimant could have discovered that his condition was a compensable one.

ARTHUR LARSON & LEX K. LARSON, 1B THE LAW OF WORKMEN'S COMPENSATION 7–696–97 (1995) (footnotes omitted) ("TREATISE"). We agree with the comments of Larson, quoted above, as they relate to the facts of this case.

■ Section 9–711 of the Act, which Larson groups in the discovery category, Treatise, at 7–702, is written in the disjunctive. Furthermore, § 9–711 is much more favorable to the covered employee or her dependents because it calls for actual knowledge. A covered employee may file a claim, time aside, after the disablement, § 9–711(a)(1), *or* upon actual knowledge that the disablement was caused by the employment, § 9–711(a)(2). In essence, § 9–711(a) provides to the covered employee or her dependents a choice of alternatives. A prerequisite to filing remains, however, in that a disablement, a *sine qua non,* must exist.

■ In the case at bar, April 25, 1991 was the first day that Ms. Helinski was unable to perform her work. Under the

web of statutory sections discussed above,[5] she could not have filed a claim until an occupational disease caused her disablement. Thus, the two year statute of limitations could not have begun to run until the date of her disablement, April 25, 1991, or the date that she first had actual knowledge that her disablement was caused by her employment. Therein lay the way of confusion followed by the Commission, and ultimately led to the Circuit Court's error. Consequently, we must reject C & P's argument that Ms. Helinski knew of her disablement in 1989 because, as defined under the Act, she was not disabled until April 25, 1991, the operative date. We hold that the Circuit Court erred in granting C & P's motion for summary judgment because Ms. Helinski, who had the option of filing her workers' compensation claim upon her disablement *or* upon the date that she first acquired actual knowledge that her disablement was caused by her employment, timely filed her claim within two years of April 25, 1991, the first day she was disabled, and, alternatively, within two years of Dr. Ziem's diagnosis, delivered on January 30, 1992, that Ms. Helinksi suffered from an occupational disease.

JUDGMENT VACATED; CAUSE REMANDED TO THE CIRCUIT COURT FOR ANNE ARUNDEL COUNTY FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION; APPELLEE TO PAY THE COSTS IN THIS COURT.

---

5. "[A]ll sections of the [Act] must be read and considered together in arriving at the true intent of the Legislature, as they form part of a general system...." *Subsequent Injury Fund v. Chapman,* 11 Md.App. 369, 274 A.2d 870, *aff'd,* 262 Md. 367, 277 A.2d 444 (1971).