818 A.2d 283

TRU–ROL COMPANY, INC. et al.

v.

Arnold C. YOX.

No. 0135, Sept. Term, 2002.

Court of Special Appeals of Maryland.

March 3, 2003.

William S. Tostanoski (Tostanoski & Martin, P.A., on brief), Baltimore, for appellants.

Thomas J. Drechsler (Thomas A. Imperiale and Carlson, Jones–Bateman & Drechsler, P.A., on brief), Baltimore, for appellee.

Argued before DAVIS, ADKINS, LAWRENCE F. RODOWSKY (Retired, Specially Assigned), JJ.

ADKINS, Judge.

This case involves the application of the statute of limitations in an occupational deafness case. On July 7, 2000, Arnold C. Yox, appellee, filed a claim with the Workers' Compensation Commission against Tru–Rol Company, Inc., and its insurer, Penn National Insurance Company, appellants. Under a heading titled "Description of Accident or How Occupational Disease Occurred," Yox reported, "many

years exposure to high[ ] levels of industrial noise." Appellants contested Yox's claim. The Commission convened a hearing on December 11, 2000, during which appellants raised the statute of limitations as a defense. The Commission agreed that the claim was barred by limitations, and denied benefits on this basis.

Yox appealed the Commission's decision to the Circuit Court for Baltimore County. The court reversed the Commission's decision, and remanded the case to the Commission for determination of its merits. In challenging the court's decision, appellants present a single issue for our review:

Did the circuit court err when it found that the statute of limitations in an occupational deafness case did not begin to run since the claimant was not "disabled" as defined by statute?

We hold that the applicable statute of limitations has run, as a matter of law, on Yox's claims. Therefore, the circuit court erred in reversing the Commission's decision, and in remanding the case to the Commission for a determination of its merits.

## FACTS AND JUDICIAL PROCEEDINGS

Yox, a man in his late sixties at the time of trial, began working at Tru–Rol when he was 20 years old. There, he "[ran] a press and vibrator[,]" [1] a job in which he was exposed to a large amount of noise. While on the job, he wore ear plugs and "ear snaps," which are placed over the ears once the ear plugs are in place.

Yox first consulted Dr. Robert Schwager, an ear, nose, and throat physician, on the advice of a family member in 1987, complaining of "ringing" in his ears. Yox testified that, at that time, he was not experiencing any difficulty hearing. The only issue at that time was the ringing.

---

1. Yox testified that the vibrator he used was similar to a jackhammer.

Dr. Schwager testified regarding his 1987 visit with Yox. According to the doctor, Yox "gave a long history of noise exposure at work. Being exposed to heavy machinery [sic]. He complained of hearing loss in the left ear."[2]

> [A]t that point the patient had an audiometric test, which revealed bilateral symmetric nerve type deafness, mild in the low frequencies to severe in the high frequencies.

> We recorded what we call speech reception of 40 decibels in each ear. Discrimination 76 and 72 percent, right and left respectively, for which we thought a hearing aid was indicated.

> The patient was ... told of the findings on the hearing test, and it was suggested that he obtain a hearing aid.... About four weeks later he returned to the office and did, in fact, obtain a hearing aid from us.

Dr. Schwager also opined, based on his 1987 audiological examination of Yox, that "[t]o a reasonable degree of medical probability ... Mr. Yox had a 35 ¼ percent hearing loss in 1987 for the right ear, and for the left ear 37 ¾ percent," and binaural impairment of 35.67 percent. Dr. Schwager testified at trial that this 1987 hearing loss was compensable under the workers' compensation statute.

Dr. Schwager again evaluated Yox in 2000, at the request of Yox's attorney. At that time, he reviewed an audiometric test record prepared by Robert Saltsman, an audiologist. Dr. Schwager opined that, "to a reasonable degree of medical probability Mr. Yox demonstrated a 33 percent hearing loss in his right ear" and a "38 percent" loss in his left ear. He also stated that, as of his 2000 evaluation, Yox had a "binaural impairment" of 33.8 percent. The doctor testified that Yox's hearing loss was "[a]pproximately two to three percent" worse in 2000 than it was in 1987.[3] He opined that Yox "suffers

---

2. Dr. Schwager's notes did not reflect that Yox had complained of ringing in his ears, or tinnitus, only "hearing loss."

3. The doctor explained that, although the numerical percentage loss did not change significantly between 1987 and 2000, Yox's hearing loss was

from noise induced sensory binaural hearing loss, which would be expected in an individual who has been exposed to loud noise on a recurrent and long term basis." He further explained that Yox's hearing impairment was "progressive" in nature, even if he were permanently removed from further noise exposure.

Yox testified that he quit his job at Tru–Rol in 1999, after 47½ years of employment with the company. He stated that his hearing loss had never stopped him from going to work, nor had it prevented him from performing any job duty. He acknowledged, however, that when he consulted Dr. Schwager in 1987, he thought that the ringing in his ears was due to his work.

[APPELLANTS' ATTORNEY]: ... You told [Dr. Schwager] that you were around heavy machinery at work[?]

[YOX]: That's right.

[APPELLANTS' ATTORNEY]: Okay.

You said as a result of being around the heavy machinery you had this ringing in your ears; is that correct?

[YOX]: Yeah. I had ringing. That's right.

[APPELLANTS' ATTORNEY]: Okay.

And you did not think that that ringing came from any other source but your work: is that correct?

[YOX]: Yeah. Because I ain't never had ringing before.

Although Yox's hearing loss continued to progress, he did not file his workers' compensation claim until July 2000, several months after he stopped working at Tru–Rol.

---

worse in 2000 because "the statute ... requires that we include a factor for the age of the patient as well as a derivation from the values found upon the hearing test result." He stated that Yox's "hearing loss did worsen [between 1987 and 2000] but not to the degree according to the calculation requirement that he aged; therefore, on the percentage based on the calculation for the rating, it looks as though he has less hearing loss in the Year 2000 than he does in 1987, but that, in fact, is a result of the calculation that we're required to make."

In reversing the Commission's decision to deny benefits based on the expiration of the two year statute of limitations, the circuit court explained in its written order that

within [the] definitional framework [of the workers' compensation statute], occupational deafness is somewhat of an anomaly. It clearly is more akin to a disease process, as it is not triggered by a single event giving rise to a discrete consequence. However occupational deafness is separately defined under LE § 9–505. In *Crawley* ..., the Court of Special Appeals found that the legislative intent in enacting LE § 9–505 was not only to provide technical criteria for measuring occupational loss of hearing, but also to make such loss compensable without regard to inability to work or loss of wages. In that regard, occupational deafness is treated differently than other forms of occupational disease.

The difficulty presented in the context of this case is that the limitations provisions under the workers' compensation statute do not address when limitations shall commence in occupational deafness claims. Rather, LE § 9–711 addresses limitations in general for occupational diseases and is triggered by disablement, which is linked to an inability to perform work....

Appellant argues that *Crawley* implicitly resolves this dispute, in that the Court determined that the legislative intent was to make hearing loss compensable when the degree of loss met certain statutory requirements without regard to disablement. That finding, however, does not also dictate that limitations under LE § 9–711 commences [two] years from the date that the loss was first compensable. In fact, in prior occupational disease decisions addressing workers' compensation limitations and its link to the concept of "disablement," the commencement of the limitations period has been tied to the employee's actual incapacitation, or inability to work.

In the context of a limitations analysis in a statutory cause of action, the reason for that interpretation seems apparent. The statute itself is defined in those terms, and must be construed by the Courts in accordance with the

plain language employed by the legislature. Furthermore, in the context of a legislative scheme intended to provide compensation without regard to fault, based on clearly defined triggering events, the link to incapacity in the occupational disease context is intended to provide a clear, defining point. Unless and until the [l]egislature chooses to define limitations for occupational deafness in another manner, limitations does not even begin to run until the hearing loss gives rise to incapacity to work, as set forth in LE §§ 9–711 and 9–502.

Displeased with the circuit court's decision, Tru–Rol noted this appeal.

## DISCUSSION

 Occupational deafness is governed by Md.Code (1991, 1999 Repl.Vol., 2002 Cum.Supp.), section 9–505 of the Labor and Employment Article ("LE"). At the time Yox filed his claim, LE section 9–505(a) provided that, with exceptions not applicable here, "an employer shall provide compensation in accordance with this title to a covered employee for loss of hearing by the covered employee due to industrial noise in the frequencies of 500, 1,000, and 2,000 cycles per second."[4] "Occupational hearing loss is an occupational disease" for purposes of the statute. *See Armco Steel Corp. v. Trafton,* 35 Md.App. 658, 659 n. 1, 371 A.2d 1128 (1977). An "occupational disease" is statutorily defined as "a disease contracted by a covered employee: (1) as the result of and in the course of employment; and (2) that causes the covered employee to become temporarily or permanently, partially or totally incapacitated." LE § 9–101(g).

LE section 9–711(a) sets the limitations period for occupational disease claims. Under that section,

[i]f a covered employee suffers a disablement or death as a result of an occupational disease, the covered employee or

---

**4.** Effective October 1, 2000, section 9–505 was changed to amend these frequencies to "500, 1,000, 2,000 and 3,000 hertz."

the dependents of the covered employee shall file a claim with the Commission within 2 years . . . after the date:

(1) of disablement or death; or

(2) when the covered employee or the dependents of the covered employee first had actual knowledge that the disablement was caused by the employment.

Failure to comply with this limitations period bars a covered employee's claim. *See* LE § 9-711(b).

Appellants cite *Crawley v. General Motors Corp.*, 70 Md. App. 100, 519 A.2d 1348, *cert. denied*, 310 Md. 147, 528 A.2d 473 (1987), in support of their position that the circuit court improperly ruled that the statute of limitations had not run on Yox's claim. Crawley was an employee at General Motors for 20 years. When he filed a 1984 workers' compensation claim for hearing loss resulting from that exposure, the Commission awarded benefits. The circuit court reversed, ruling that " 'disablement' was a necessary threshold element of a compensable claim for occupational deafness," and Crawley's work had not yet been affected by his hearing loss, so he was not yet "disabled" under the terms of the statute. *See id.* at 102, 519 A.2d 1348.

The *Crawley* circuit court denied compensation, resting its decision on the Court of Appeals' decision in *Belschner v. Anchor Post Products, Inc.*, 227 Md. 89, 175 A.2d 419 (1961). In *Belschner*, the Court held that a saw operator who, while suffering from substantial hearing loss, was still performing his duties as a saw operator in a satisfactory manner and without any loss in wages, was not "disabled" under the terms of the workers' compensation statute, and therefore could not yet recover benefits based on that hearing loss.[5] *See id.* at 95,

---

5. Md.Code (1991, 1999 Repl.Vol., 2002 Cum.Supp.), section 9-502 of the Labor and Employment Article, governing compensation for "occupational disease," defines the term "disablement" as

the event of a covered employee becoming partially or totally incapacitated:
(1) because of an occupational disease; and

175 A.2d 419. The *Belschner* Court also noted that, if changing the law was necessary, it was the legislature's job, not the Court's, to do so. *See id.* The *Crawley* circuit court adopted the *Belschner* rationale in denying compensation.

We reversed the decision of the circuit court, holding that the Commission properly had awarded Crawley compensation for his hearing loss, despite the absence of any effect on his ability to work. *See Crawley*, 70 Md.App. at 107–08, 519 A.2d 1348. Judge Bloom, writing for the Court, summarized the parties' arguments:

> [Crawley's] position [was] that in enacting section [9–505] the [l]egislature was responding to the *Belschner* Court's invitation to change the law. [Crawley's employer], on the other hand, contend[ed] that by placing section [9–505] in the midst of those sections . . . dealing with occupational diseases, the [l]egislature intended the disability or disablement requirement for compensation for all occupational diseases . . . to apply to section [9–505]. [Crawley's employer] view[ed] section [9–505] as merely establishing highly technical criteria for measuring occupational deafness.

*Id.* at 105, 519 A.2d 1348 (footnote omitted).

We adopted the position taken by Crawley that section 9–505 was enacted in response to *Belschner*. At the time of the *Crawley* decision, current section 9–505 was codified as Article 101, section 25A, which provided:

> (b) For compensation purposes losses of hearing due to industrial noise shall be confined to the frequencies of 500, 1000, and 2000 cycles per second. Loss of hearing ability for frequency tones above 2000 cycles per second are not to be considered as constituting disability for hearing.

*Id.* at 104, 519 A.2d 1348. Section 25A was enacted after *Belschner*, and remains substantively the same today, although recodified as LE section 9–505(a). *See Revisors Note* to former Md.Code (1991), § 9–505 of the Labor and Employ-

---

(2) from performing the work of the covered employee in the last occupation in which the covered employee was injuriously exposed to the hazards of the occupational disease.

ment Article (although it worded the statute somewhat differently, the legislature did not intend any substantive change to this provision through these subtle changes in language).

Observing that "[t]he language of section 25A does not specifically state whether the General Assembly intended to eliminate disablement as a precondition of recovery for occupational deafness[,]" *Crawley,* 70 Md.App. at 106, 519 A.2d 1348, the *Crawley* Court looked to the legislative history of section 25A to resolve the ambiguity it perceived.

> During the legislative process, what is now section 25A originated as House Bill 473. House Bill 473 was one of eight bills introduced on February 17, 1967, by Delegate Sol J. Friedman to effectuate changes to article 101 suggested three days earlier in the Seventh Report of the Governor's Commission to Study Maryland's Workmen's Compensation Laws. It was the recommendation of the Commission, of which Delegate Friedman was a member, that occupational loss of hearing be made compensable irrespective of disablement. We believe House Bill 473 was sufficient to accomplish just that....
>
> **Based on the available legislative history, we believe that the [l]egislature intended,** in enacting section 25A, not only to provide technical criteria for measuring occupational loss of hearing but also **to make such loss compensable without regard to inability to work or loss of wages.**

*Id.* at 106–07, 519 A.2d 1348 (emphasis added) (citation and footnotes omitted).

*Crawley* involved the calculation of benefits in a workers' compensation case. The statute generally provides that an employer must pay the applicable weekly benefit "for the period that the covered employee is ... disabled."[6] *See* LE § 9–615(b)(temporary partial disability); LE § 9–621(b) (temporary total disability); LE § 9–637(b)(permanent total dis-

---

**6.** LE section 9–627, governing compensation for permanent partial disability, does not specifically state that the starting date for benefits is the date of initial disablement, but nothing in the language of 9–627 suggests that the starting date for computation of benefits is any

ability). Gilbert and Humphreys point out that LE section 9–505 was enacted out of a legislative recognition that "an injured worker could be left without a remedy" in an occupational hearing loss case because, in such cases, there is often no "attendant 'disability[.]' " *See* Richard P. Gilbert & Robert L. Humphreys, Jr., *Maryland Workers' Compensation Handbook* § 8.13, at 178 (2d ed.1993).

Here, the circuit court refused to expand the *Crawley* holding past the realm of benefits calculation, reasoning that there was no evidence that the legislature intended, through its adoption of section 9–505, to affect the applicable statute of limitations. Although the circuit court provided a thoughtful analysis of the issue, the problem, as Tru–Rol points out, is that, "under [the circuit court's] theory, there would effectively be **no** statute of limitations in hearing loss cases since rarely are there instances where there is an inability to perform work." (Emphasis added.) In other words, if there is no "disability" in occupational deafness cases, because the hearing loss never affects the employee's ability to work, the statute of limitations under section 9–711 is **never triggered.**

In order to resolve this conundrum, we turn to several established canons of statutory construction. As always, "[t]he search for legislative intent begins with an examination of the statute itself and if the language is of clear import, the inquiry ends." *Crawley,* 70 Md.App. at 105, 519 A.2d 1348. "The plain language [of a statute, however,] can not be viewed in isolation; rather, the entire statutory scheme must be analyzed as a whole." *Outmezguine v. State,* 335 Md. 20, 41, 641 A.2d 870 (1994). Furthermore, " 'we seek to avoid constructions that are illogical, unreasonable, or inconsistent with common sense.' " *Ward v. Dep't of Public Safety & Correctional Svcs.,* 339 Md. 343, 352, 663 A.2d 66 (1995) (citation omitted).

With these canons of construction in mind, we hold that, in an occupational deafness case, the statute of limita-

---

different than for temporary partial, temporary total, and permanent total disability.

tions begins to run when the hearing loss becomes compensable under section 9–505, or when the employee "first ha[s] actual knowledge that the disability [*i.e.*, the compensable hearing loss], was caused by the employment." *See* LE § 9–711(a). In other words, we interpret the term "disability" in section 9–711(a), for purposes of occupational hearing loss claims, in the *Crawley* sense of the word.

Although this construction may be a mere unintended consequence of the legislature's adoption of section 9–505, we think it is the only reasonable way to construe the statute. Otherwise, a worker could be compensated for his or her hearing loss before the statute of limitations on his or her claim even began to run.[7] This interpretation would lead to a result that is "illogical, unreasonable, [and] inconsistent with common sense." *See Ward*, 339 Md. at 352, 663 A.2d 66.

Besides this practical difficulty, to interpret the term "disability" in section 9–505, governing occupational deafness, in terms of a certain level of hearing loss, and in section 9–711, governing statutes of limitations, in terms of an inability to perform work, would constitute an inconsistent construction of the statute as a whole.[8]

---

**7.** In *Lumsden v. Design Tech Builders, Inc.*, 358 Md. 435, 749 A.2d 796 (2000), the Court of Appeals explained the policy bases for statutes of limitation. According to the Court, statutes of limitation

were enacted in an effort to balance the competing interests of potential plaintiffs, potential defendants, and the public. The statutory period provided by a statute of limitations represents a compromise of these interests and "reflects a policy decision regarding what constitutes an adequate period of time for a person of ordinary diligence to pursue his claim." By creating a limitations period, the legislature determined that a plaintiff should have only so long to bring his action before he is deemed to have waived his right to sue and to have acquiesced in the defendant's wrongdoing. Limitations statutes therefore are designed to (1) provide adequate time for diligent plaintiffs to file suit, (2) grant repose to defendants when plaintiffs have tarried for an unreasonable period of time, and (3) serve society by promoting judicial economy.

*Id.* at 441–42, 749 A.2d 796.

**8.** Yox relies heavily on *Helinski v. C & P Tel. Co.*, 108 Md.App. 461, 672 A.2d 155, *cert. denied*, 342 Md. 582, 678 A.2d 1047 (1996), in support of

Here, Yox testified at the circuit court hearing that, in 1987, when he first consulted Dr. Schwager, he thought that the ringing in his ears was related to his work at Tru–Rol. Thus, at that time, not only did Yox have compensable hearing impairment, he also had actual awareness that his hearing impairment was related to his employment. The fact that Yox may not have known that his hearing problem was **compensable** at this point in time does not change the result. This is because when Yox consulted Dr. Schwager, and was informed that he was in need of a hearing aid, he was placed on inquiry notice that he might have a claim against Tru–Rol, given his testimony that he thought at that time that his hearing problems were a result of workplace noise exposure. As we explained in *Doe v. Archdiocese of Washington,* 114 Md.App. 169, 188, 689 A.2d 634 (1997) (citation omitted), "[t]he statute of limitations begins to run when the potential plaintiff is on 'inquiry notice' of such facts and circumstances that would 'prompt a reasonable person to inquire further.'" In other words, from this point in time, Yox had two years to investi-

---

his contention that "disability," in the sense of inability to work or loss of wages, still triggers the statute of limitations under section 9–711, even in occupational deafness cases. In that case, we quoted a passage from *Larson's Workmen's Compensation Law* that set forth the modern view that the limitations period in occupational disease cases " 'begins to run when the disease has culminated in disability and when by reasonable diligence the claimant could have discovered that his condition was a compensable one.'" *Id.* at 472, 672 A.2d 155 (quoting Arthur Larson & Lex K. Larson, 1B *The Law Of Workmen's Compensation* 7–696–97 (1995)). While generally indicating our agreement with that rule, we recognized that LE section 9–711 was

more favorable to the covered employee . . . because it calls for actual knowledge. A covered employee may file a claim, time aside, after the disablement, § 9–711(a)(1), *or* upon actual knowledge that the disablement was caused by the employment, § 9–711(a)(2). In essence, § 9–771(a) provides to the covered employee . . . a choice of alternatives.

*Id.* at 473, 672 A.2d 155.

The problem with Yox's reliance on *Helinski* is that *Helinski* concerned an ordinary occupational disease case, not occupational deafness, a condition that is treated distinctly under the statutory scheme, as evidenced by section 9–505. Thus, we do not perceive *Helinski* to dictate our holding in this case.

gate whether his hearing problem was a compensable hearing loss, and, if so, to file a workers' compensation claim.

Yox asserts that this construction "renders the clear verbiage used in the statute meaningless as a guide to hearing loss claimants and their counsel." Second, he argues, "[i]t is ... dangerous to thrust upon hearing loss claimants the onerous and unusual responsibility of knowing impairment ratings and how those ratings fit into the Act's statutory scheme." Regarding Yox's first contention, litigants and their counsel routinely consult not only the applicable statute, itself, but also any caselaw **interpreting** that statute, in order to discern the import of its language. Regarding his second argument, we do not see how our holding places on a hearing loss claimant a burden that is any more "onerous" than that of other plaintiffs who must comply with the applicable statute of limitations. Once a claimant is made aware that he or she has suffered hearing loss as a result of his or her employment, that claimant then has a duty to investigate, within two years, whether that hearing loss is compensable, and if so, to file a workers' compensation claim. A claimant need not be intimately familiar with impairment ratings to investigate his or her injury in this manner.

Accordingly, we hold that the two-year statute of limitations under section 9–711 ran, as a matter of law, in 1989, two years after Yox's 1987 visit with Dr. Schwager. Thus, Yox's workers' compensation claim, filed in 2000, was untimely. We reverse the judgment of the circuit court, and hold that the statute of limitations bars Yox's workers' compensation claim as a matter of law.

**JUDGMENT REVERSED. COSTS TO BE PAID BY APPELLEE.**